Jerald KENDRICK, et al., Plaintiffs,

v.

David BLAND, et al., Defendants.

James THOMPSON, et al., Plaintiffs,

v.

David BLAND, et al., Defendants.

United States of America, Amicus Curiae.

Civ. A. Nos., 76–0079–P(J), 79–0092–P(J).

United States District Court,
W.D. Kentucky,
Paducah Division.

May 29, 1984.

Oliver H. Barber, Patricia G. Walker and Thomas Banazynski, Gittleman & Barber, Louisville, Ky., Christine Freeman, Southern Prisoners Defense Committee, Atlanta, Ga., Joseph Elder, Louisville, Ky., for plaintiffs.

Barbara W. Jones, Linda Cooper, David Sexton, Kentucky Corrections Cabinet, Frankfort, Ky., for defendants.

## MEMORANDUM OPINION

JOHNSTONE, District Judge.

This matter is before the court on the motion of the plaintiff class to hold the defendants in contempt for their failure to comply with the requirements of the Consent Decree entered in this action and denial of meaningful access to the courts as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. The court, for the convenience of the parties, conducted a two-day evidentiary hearing at the Kentucky State Penitentiary (KSP), Eddyville, Kentucky on September 1 and 2, 1983.

At the close of the hearing, the court made a preliminary finding that, while both sides are attempting to implement and comply with the terms of the Consent Decree, the defendants were in violation of certain provisions of the agreement. At the request of the parties an extended post-hearing briefing schedule was authorized, and this matter did not stand submitted for a ruling by the court until February 6, 1984. A transcript of the hearing is not available at this time.

This action was originally filed in 1976 by inmates incarcerated at KSP as *pro se* litigants, upon the court's grant to proceed *in forma pauperis.* The prisoners' challenge arose from their confinement at Kentucky's maximum security prison for men pursuant to Title 42 of the United States Code, Section 1983.

A class representing all penitentiary inmates was certified and counsel appointed by order entered October 10, 1978. The KSP class was subsequently consolidated with a class action on behalf of all inmates at the Kentucky State Reformatory (KSR), LaGrange, Kentucky, a medium security prison.

After extensive discovery, but before trial, a Consent Decree was agreed to by all parties and approved by the court in this action on April 14, 1980. The Consent Decree was supplemented July 22, 1980, October 22, 1980 and November 11, 1981 (guard harassment). *Kendrick v. Bland,* 541 F.Supp. 21 (W.D.Ky.1981) (Consent Decree at 27, Appendix 1).

The prisoners' present claim raises two questions:

1) Whether all inmates, including prisoners in restricted confinement, are accorded meaningful access to the courts;

2) Whether the Kentucky Corrections Cabinet's policy, or the enforcement thereof, limiting legal supplies and services to prisoners, denies them meaningful access to the courts.

## I. FINDINGS OF FACT

1. An order of the court entered October 10, 1978 in *Kendrick v. Bland,* Civil Action No. 76–0079–P(J), certified a plaintiff class "composed of all persons present-

ly confined in the Kentucky State Penitentiary, and those who may be so confined in the future." Another order, entered June 4, 1979 in *Thompson v. Bland,* Civil Action No. 79–0092–P(J), certified a class "defined as all persons who currently and/or will be confined in the Kentucky State Reformatory at LaGrange."

2. The defendants are all agents, employees, and officials of the Kentucky Corrections Cabinet.

3. At the hearing, the following inmate class members testified: Wayne Graham, Robert Oldham, James Higgs, Greg Ivey, Eugene Gall, Robert Williamson, Narvel Tinsley, Joseph Reardon, Douglas Ward, Thomas Smith, William Kimbrew and Thomas Shifflett. The plaintiffs' witnesses also included: Lynn Aldridge, a paralegal assigned to KSP employed by the Kentucky Office for Public Advocacy, the state agency charged with assisting inmates with post criminal conviction relief; KSP Warden Al C. Parke; Correctional Officer Lawrence Newsome, the security officer assigned to the KSP legal aide office in August-September 1983; and Steve Welch, Chief of Institutional Services, Burr Oak Library Region, which serves ten correctional institutions in northern Illinois.

4. At the hearing, the defendants called Warden Parke and Phil Parker, KSP Program Director.

5. Under the terms contained in the Consent Decree the parties agreed to the following provisions pertaining to access to the courts:

### ACCESS TO THE COURTS

Defendants agree to implement a plan for maintaining and operating the law library at both institutions [KSP and KSR] upon the advice and recommendations of the respective librarians at each institution and the respective member of the Office for Public Advocacy with the advice and consultation of a competent law librarian within three (3) months. At a minimum, the defendants agree to provide the following:

*Federal Materials*

1) West's Supreme Court Reports, or Lawyer's Edition 1960 and forward;

2) Federal Second Reporter, 1960 and forward;

3) Federal Supplement Reports, 1960 and forward;

4) United States Code Annotated, West Publishing Company:
 (a) Index volumes
 (b) Constitution of the United States volumes
 (c) Title 18 volumes
 (d) Title 28 volumes
 (e) Title 42 volumes

5) Federal Practice Digest, Second Series;

6) Paperback edition—Federal Rules of Civil Procedure, Evidence, Appellate Procedure and Title 28, West Publishing Company;

7) Paperback edition—Federal Rules of Criminal Procedure, Evidence, Appellate Procedure and Title 18, West Publishing Company;

8) Shepard's United States Citations;

9) Shepard's Federal Second and Federal Supplement Citations.

*Kentucky Materials*

1) Kentucky Revised Statutes;

2) Kentucky Digest, West Publishing Company;

3) Southwestern Report, 2d Series, Kentucky cases, entire series, for the years preceding the publication of S.W.2d, either Southwestern Reporter or the official reports of the Kentucky Court of Appeals;

4) Shepard's Kentucky or Southwestern Reporter Citations.

*Miscellaneous Publications*

1) Corpus Juris Secundum:
 (a) Habeas Corpus volumes
 (b) Appeal and Error Volumes
 (c) Constitutional Law volumes.

2) * Black's Law Dictionary;

3) * Cohen, *Legal Research in Nutshell;*

4) Criminal Law Reporter;

5) * Israel, *Criminal Procedure in a Nutshell;*

6) * Murrell, *Kentucky Criminal Law;*

7) Sokol, *Federal Habeas Corpus;*

8) Prison Law Monitor;

9) Wright, *Federal Courts;*

10) * Potts, *Prisoners Self-Help Litigation Manual;*

11) * ACLU Handbook, *The Rights of Prisoners;*

12) * Bronstein, Hirschkop, *Prisoners' Rights,* 1979.

* Each of the books by which there is an asterisk shall be furnished in at least three (3) copies.

Defendants agree that all volumes will be kept up to date according to the publishers' revisions. In addition, the plan shall include provision for expansion of the law library facilities sufficient to meet the needs of the prisoners.

In cooperation with the Office for Public Advocacy, defendants will hire within four (4) months of the entry of this Decree, three more assistant public advocates, four (civilian) paralegal assistants, and two senior clerk typists to be distributed between the Penitentiary and the Reformatory. The Office for Public Advocacy will continue to serve in a resource capacity for the Bureau [now the Kentucky Corrections Cabinet] and for prisoners when the subject matter goes beyond post-conviction relief.

Inmate legal aides shall be chosen on the basis of an open competitive written and oral examination designed to test legal aides. Inmate legal aides will continue to be given a two-week training program established by the Office for Public Advocacy. The instructors for this program are confined to attorneys, judges, and clerks throughout the Commonwealth. The training program for legal aides totals 80 classroom hours.

The first week of instruction involves a survey and review of:

Criminal Law & Procedure

Civil Procedure

Domestic Law

History and Evolution of the Law

Appellate Courts and Procedure

Federal Courts

Preparation of Federal Habeas Corpus Petitions Administrative Law with emphasis on parole and probation revocation and disciplinary hearings Post Conviction Remedies

The second week consists of instruction in legal research and writing which culminates in a moot court type practice session.

Defendants agree to develop with the Office for Public Advocacy a plan within six (6) months for continuing legal education of legal aides.

Defendants agree that any prisoner capable of assisting other prisoners in the preparation of legal papers or in the prosecution of a lawsuit may do so without fear of disciplinary action, provided that the particular prisoner has been appointed or is seeking appointment by a court to so assist another prisoner. In the alternative, defendants will not oppose the entry of a Decree by this Court permitting the appointment of any prisoner to assist another prisoner, in the defense or prosecution of legal proceedings upon a showing that such prisoner is capable of rendering such assistance. Defendants further agree that neither inmate legal aides nor appointed inmate legal assistants will be removed from their jobs or receive any other disciplinary action for filing any legal action against defendants, their agents, or their employees.

*Kendrick v. Bland,* 541 F.Supp. at 34, Appendix I, section 8.

6. The Consent Decree also provides for "[p]rograms such as ... access to the law and regular library ..." for inmates in restrictive confinement, *Kendrick v. Bland,* 541 F.Supp. at 33, Appendix I, section 7, and permission to chose inmate counsel and confer with the inmate at least 24 hours before any disciplinary proceeding before the institution's Adjustment Committee, *Kendrick v. Bland,* 541 F.Supp. at 32, Appendix I, section 6A(3)(b).

7. In the Consent Decree, the defendants further agreed to evaluate and plan for inmates in restrictive confinement "in light of American Correctional Association

Standards." *Kendrick v. Bland,* 541 F.Supp. at 33, Appendix I, section 7.

8. The Kentucky State Penitentiary, by letter dated August 15, 1983, was formally awarded three-year accreditation by the American Correctional Association (ACA). (Dfts' Ex. # 1). While the full ACA report is not before the court, the brief letter tendered as an exhibit by the defendants specifically makes reference to an appeal by the defendants objecting to a finding by the ACA inspection committee that the KSP law library services are not in conformity with ACA Standard 4413 because the facility is open an insufficient period of time. The committee upheld its initial finding of noncompliance and rejected the defendants' appeal. The record is silent as to whether the defendants are in compliance with any of the relevant access to the courts provisions contained in either the 1977 (operative when the defendants entered the Consent Decree) or present ACA Standards.

9. On July 14, 1983, a month and a half before the hearing, there were approximately 700 inmates housed at KSP. Of this number approximately 470 were classified in the general inmate population and approximately 230 were classified in some form of restrictive confinement. The population in restrictive confinement includes 84 inmates in disciplinary and administrative segregation, 5 inmates in administrative control unit, 100 inmates in protective custody, 17 inmates on death row, 22 inmates classified as special needs, and one inmate confined in the KSP hospital. (Dfts' Answers to Interrogatories 7/29/83).

10. According to the defendants' administrative regulations, the KSP legal aide office is to be staffed with 10 trained inmate legal aides, one inmate photocopy clerk, one inmate legal aide librarian, and one supervising correctional officer. OM# 100000–20(A)(1)(a) (Dfts' Ex. # 2). In September 1983 only 7 inmate legal aides staffed the legal aide office. (Ivey testimony 9/1/83). Even when the full complement of legal aides is available, the evidence indicates that they are overworked. (Ivey testimony 9/1/83; Parker testimony 9/2/83).

11. In the months preceding the hearing, Officer Lawrence Newsome served as "supervising" correctional officer at the legal aide office. Newsome is a high school graduate and is currently taking courses at Murray State University. He has received the standard inmate legal aide training but has no other legal training or experience. (Dfts' Answers to Interrogatories 7/29/83). Despite his supervisory title and the requirement of section 1(F) of the Consent Decree that the "[d]efendants shall immediately explain the terms of the Decree to all of their ... employees, including institutional staff, guards and other personnel, in order to assure their understanding of the requirements of this Decree and the necessity for strict compliance therewith," *Kendrick v. Bland,* 541 F.Supp. at 28, Appendix, I, Section 1(F), Newsome reported that no one had ever explained to him the terms or requirements of the Consent Decree. (Welch testimony 9/1/83; Plfs' Ex. # 17). Moreover, Newsome acknowledged that there were perhaps only 4 or 5 copies and not 10 copies of the Consent Decree, as required by section 1(G), available to inmates at the legal aide office. (Welch testimony 9/1/83; Plfs' Ex. # 17). There is no law librarian at KSP; however, there is one inmate law librarian who has received the basic legal aide training.

12. In compliance with section 8 of the Consent Decree, the defendants, through OPA, offer an annual legal aide training session. OM# 100000–23 (Dfts' Ex. # 2; Plfs' Ex. # 33—OPA letter 8/23/83). As currently offered, the course consists of 24½ hours of video-tape presentations on the following subjects: law and its development; the Kentucky court system; the federal court system; federal habeas corpus; criminal law and procedure; pleading forms; appellate procedure; post-conviction and extraordinary writs; inmate litigation; oral arguments; administrative law; civil procedure; domestic relations; legal research; and legal writing. (Plfs' Ex. # 33 & 34—OPA letter 8/23/83). In addition, a day and a half are devoted to researching a moot court problem, drafting a brief and presenting an oral argument.

(Plfs' Ex. # 33 & 34—OPA letter 8/23/83). Welch testified that "only 54 hours of basic inmate legal aide training is offered annually," contrary to the provision agreed to by the defendants in section 8 of the Consent Decree that "[t]he training program for legal aides totals 80 classroom hours." (*Cf.* Welch testimony 9/1/83 and Plfs' Ex. # 17 *with Kendrick v. Bland,* 541 F.Supp. at 35, Appendix I, section 8). Welch testified that even if the full 80 hours of basic legal training were offered, it would be unreasonable to expect a noncollege graduate to learn all that is necessary to adequately assist an inmate litigant after only 80 hours of classroom training. (Welch testimony 9/1/83). The first continuing legal education for inmate legal aides was offered July 28 and 29, 1983, just over one month before the hearing. (Plfs' Ex. # 33 —OPA letter 8/23/83).

13. The inmate legal aides and the inmate law librarian do not receive any substantive, legal supervision from any corrections staff or any other person. (Parker testimony 9/2/83; Welch testimony 9/1/83). Each inmate legal aide obtains clients by referrals or by direct requests. An inmate legal aide may handle as many as 50 active cases. (Ivey testimony 9/1/83). Each inmate legal aide has the discretion to set the number of cases he takes and the "clients" he accepts or rejects. There are no centralized records-keeping for inmate legal aides. Thus, delays frequently result when inmate legal aides are transferred and keep or destroy their "clients" files. (Oldham testimony 9/2/83). No one other than the individual inmate legal aide reviews the legal advice or legal decisions he gives. (Parker testimony 9/2/83). Neither the correctional officer supervising the legal aide office (Newsome), his two administrative supervisors, Ed Gray, Assistant Program Director and Parker, nor anyone else provides any legal advice or legal supervision to the inmate legal aides. (Ivey & Newsome testimony 9/1/83; Parker testimony 9/2/83).

14. The legal aide office is a 2,320 square feet office building of which 1,400 square feet are available for inmate use. (Dfts' Answers to Interrogatories 7/29/83).

Only 600 square feet, however, are actually available for inmate research. (Welch testimony 9/1/83). The legal aide office is equipped with a law library, private offices for OPA attorneys, work tables and typewriters for general use, desks and typewriters for inmate legal aides, and a copy machine. OM# 100000–20(A)(2)(a); CPP 14.4; OM# 100000–24 (Dfts' Ex. # 2). There is only one inmate law library at KSP, although there was a limited law library for inmates in restricted confinement in Three Cellhouse until 1981.

15. The budget allocation for law books at the legal aide office is $5,000 per year. (Dfts' Answers to Interrogatories 7/29/83). There is no evidence of record of what was actually spent, and both Parke and Parker testified that they were not familiar with the actual cost of the inmate legal services program. (Parke testimony 9/1 & 2/83; Parker testimony 9/2/83). The uncontroverted evidence shows that in disregard to section 8 of the Consent Decree, no plan has been developed in consultation with any professional librarian; only one title has been added since April 4, 1980; and many volumes on the mandatory list are missing or have not been updated. (Welch testimony 9/1/83 & 9/2/83; Plfs' Ex. # 17). A few days before the hearing, August 29, 1983, Welch visited the KSP law library and observed that it was in "chaos" with volumes missing and out-of-date along with advance sheets and supplements unfiled. (Welch testimony 9/2/83). Upon inquiry, neither Newsome nor Parker would acknowledge who is responsible for library supervision and maintenance, despite policy OM# 100000–23 charging them with supervision responsibility. (Welch testimony 9/1/83). In reality, no one is in charge of the legal services program. The defendants rely exclusively on the inmate legal aides to ensure that the library is current and that the materials are available to the users. (Parker testimony 9/2/83).

16. Pursuant to the directions of the court, the defendants submitted on September 13, 1983 a large quantity of Kentucky Correction Cabinet purchase orders dated from 1980 through 1983. Many are ad-

dressed to the "inmate legal aide office;" some to the OPA office where a law library is maintained for the exclusive use of the resident OPA staff; some to the KSP "business office" and many others simply to KSP. (Dfts' Compliance 9/13/83 Ex. # C). The tender of these documents, however, does not refute the weight of evidence in the record that the KSP law library is in noncompliance with the law book provision of the Consent Decree. The testimony of Welch that the law library is in noncompliance is supported by the defendants' most current law library inventory supervised by Parker. (Dfts' Answers to Interrogatories # 2, Ex. # 1—4/1/83 inventory list of KSP law library contents). Moreover, in May 1982, the defendants were put on notice by an OPA consulting librarian that the KSP law library had "problems" due to a lack of organization and a significant number of missing volumes. (Dfts' Compliance 9/13/83, Ex. # B—memo dated 5/27/82 from McComb to Parker). The defendants offered no evidence to justify their failure to comply with the specific and unambiguous terms of the Consent Decree governing the KSP inmate law library except that Parker ordered some unspecified missing books within two months before the hearing. (Parker testimony 9/2/83). Complicating defendants' compliance, however, is the fact that some inmates vandalize the law library facility and books. (Newsome testimony 9/1/83; Parke testimony 9/2/83).

17. Prisoners in the general population are permitted to go to the prison law library, which is located in the prison yard, to do research. The law library and legal office are open daily, Tuesday through Saturday, for approximately 8 hours. OM# 100000–20(A)(3)(a) (Dfts' Ex. # 2). The hours of opening and closing are variable at the discretion of the warden. (*Cf.* Dfts' Answers to Interrogatories 7/29/83 *with* OM# 100000–20(A)(3)(a)). Staff members and guards are not on duty in the library during the hours when it is not open and the building is generally locked during those hours.

18. Except for inmate legal aides, sign-up for library time is on a first-come, first-served basis. To be admitted, each prisoner must present his identification to the security officer and may utilize the office for a maximum of 3 hours per admittance. There is no limit on the number of admittances permitted per week. A maximum of 15 inmates (not including the 10 inmate legal aides) may use the legal office. OM# 100000–20(A)(4)(a) (Dfts' Ex. # 2; Dfts' Answers to Interrogatories 7/29/83). Prison regulations provide that legal materials cannot be "checked out" or removed from the library, except overnight by inmate legal aides. OM# 100000–23 (Dfts' Ex. # 2; Dfts' Answers to Interrogatories 7/29/83).

19. The parties have stipulated that no KSR inmates in restricted confinement have physical access to the KSR law library. (Parties' Stipulation 10/17/83). Similarly, inmates in restricted confinement at KSP are not permitted to go to the prison law library, with the limited exception of protective custody inmates. Protective custody (pc), as the name implies, is for prisoners who fear for their safety if they are housed with the general population. Accordingly, pc and general population inmates must be kept segregated to ensure institutional security. Not more than five pc inmates may visit the law library in a group, and then only on Mondays from 8:30 A.M. to 10:30 A.M. Time used in moving the pc inmates from cell to the library is credited against the limited two-hour library visit. OM# 100000–20(A)(3)(a) (Dfts' Ex. # 2; Dfts' Answers to Interrogatories 7/29/83; Graham testimony 9/2/83).

20. With the exception of 100 pc inmates, the remaining 130 inmates in restricted custody have neither physical access to the law library or inmate legal aides. The defendants offer that this policy is required to preempt the potential exchange of contraband in the legal office and avoid security risks inherent in escorting these inmates across the prison yard. (Parke testimony 9/2/83). Parke further testified that, because of their lack of education and motivation, many restricted inmates would be unable to do their own legal research even if they were afforded

unlimited physical access to the law library. (Parke testimony 9/2/83). The education level of the inmates is not of record. The inmates in restrictive custody may obtain legal materials and legal assistance by making telephone calls or written requests to the legal aide office or OPA, through their caseworker or unit guards. These phone calls can only be made on Tuesday, Thursday, Friday and Saturday, between 9:00 A.M. to 10:30 A.M. and 1:00 P.M. to 2:30 P.M.; such phone calls may only be made to assigned inmate legal aides or OPA and are limited to 10 minutes. CPP 10.2; OM# 060000–02; OM# 060000–03; OM# 100000–22; OM# 060000–12 ((Dfts' Ex. # 2). There is only one telephone available for the 150 inmates in Three Cellhouse, where all restricted inmates except special needs and pc are housed.

21. Welch testified that the existing phone system is inadequate. First, 10 minutes is too short to convey all the necessary information between inmates to even support a grievance claim and even more inadequate for the recitation of facts necessary to support a civil rights claim. Secondly, with all the "noise, confusion, and disruptions" in the segregated areas, practical access is impossible. (Welch testimony 9/1/83).

22. Effective June 1, 1983 defendants acknowledge that inmate access to the courts for segregated inmates is more restricted than under previous institutional policies. The defendants justify such restrictions as a necessary part of the disciplinary measures to be imposed upon the inmates in punitive segregation. (Parker testimony 9/2/83).

23. From April 1983 through at least August 1983, only one OPA attorney available at KSP to assist the entire inmate population. (Aldridge testimony 9/1/83; Plfs' Ex. 33—OPA letter 8/23/83). In addition, inmates may call OPA attorneys in Frankfort, Kentucky collect if the attorney will accept the charges. Official OPA policy prohibits collect calls, however, in practice, some are accepted or at least returned. (Aldridge testimony 9/1/83). Approximately 50 to 75 percent of the KSP inmates are represented by OPA public defenders.

(Aldridge testimony 9/1/83). OPA attorney services are limited by statute to provide only for "the representation of indigent persons accused of crimes or mental states which may result in their incarceration or confinement." K.R.S. 31.010. Accordingly, OPA personnel do not handle inmate civil actions, disciplinary matters, or grievances.

24. Any inmate may call his OPA or private attorney collect once per week. The prison policy provides that phone calls by inmates to attorneys will not be monitored if the inmate notifies the officer who issues phone chips that the call is to a lawyer. Inmate calls to attorneys are, at least initially, monitored though to confirm that the call is to an attorney. (Reardon testimony 9/2/83). This measure is necessary to curb past abuse and inmate telephone fraud. (Parke testimony 9/2/83). Additional phone calls may be approved by the warden if a written request setting out the identity of the attorney and time the call is to be made. OM# 100000–20(E) (Dfts' Ex. # 2).

25. Death row inmates may call their OPA attorneys twice per month on specific days at 9:30 A.M. OM# 060000–03 (Dfts' Ex. # 2).

26. Protective custody inmates may make one 15 minute attorney phone call per week. OM# 060000–09 (Dfts' Ex. # 2).

27. All pc inmates are served by one legal aide, assigned to the entire unit. This legal aide is supposed to visit the unit once or twice per week. OM# 060000–04; OM# 100000–22 (Dfts' Ex. # 2). There is no confidential area for these visits and the legal aide may not bring legal materials with him on these visits. The defendants acknowledge that the one legal aide assigned to the pc unit is too busy to adequately meet all the reasonable legal needs of the unit's residents. (Parker testimony 9/2/83; Oldham-pc inmate-testimony 9/2/83; affidavits of pc inmates: Terry Wittall 5/12/83, Jeffrey Applegate 5/17/83, William E. Robinson 5/4/83, James M. Tuggle, Jr. 5/17/83; Plfs' Compliance List of Ex. 6/29/83).

28. As of August 24, 1983 one inmate legal aide was assigned to serve the 22 inmates in the special needs unit in Two Cellhouse. (Ivey testimony 9/1/83).

29. Free legal supplies are only issued to assigned inmate legal aides and inmates certified as indigent institutional policy. Other inmates must purchase all legal supplies (such as envelopes, file folders, pads, pens, pencils, typing paper, and carbon paper) from the institution canteen. OM# 100000–20(c); OM# 060000–08 (Dfts' Ex. # 2).

30. According to the most recent canteen price list, legal supplies and their respective cost at the canteen are as follows:

| | |
|---|---|
| notebook paper 30 ct | $ .42 |
| notebook paper 200 ct | 1.29 |
| writing tablet | .53 |
| envelope sm. 20 ct | .13 |
| envelope legal 10 ct | .13 |
| envelope box | .66 |
| Bic pens med. | .25 |
| Bic pens fine | .32 |
| Reliance pens | .13 |
| stamps (postcard) | .13 |
| stamps (letter) | .20 |

(Dfts' Response to Production of Documents 8/29/83 Ex. # 3).

31. Inmates who have been certified as indigent may be issued, upon request, supplies in the following amounts, but in practice are routinely provided less, unless the inmate can demonstrate that he will be using the supplies for bonafide legal work:

| | |
|---|---|
| lined paper | 15 sheets |
| carbon paper | 2 sheets |
| typing paper | 15 sheets |
| ink pen | exchange basis |
| pencil | exchange basis |
| envelopes | as needed |

OM# 100000–20(C)(3) (Dfts' Ex. # 2).

32. Inmate legal aides may be issued legal office supplies weekly, up to the following amounts:

| | |
|---|---|
| lined paper | 3 pads |
| carbon paper | 5 sheets |
| typing paper | 50 sheets |
| ink pens | exchange basis |
| pencils | exchange basis |
| file folders | 25 quarterly |

| | |
|---|---|
| envelopes | as needed |
| typewriter ribbons | exchange basis |

OM# 100000–20(C)(5)(a) (Dfts' Ex. # 2).

33. Postage for outgoing mail to attorneys, courts, parties for legal pleadings, witnesses, investigators or researchers for the inmate, must be paid by the inmate, unless the inmate has been certified indigent. Inmates requesting free postage must make the request to the legal office supervisor and must leave their legal mail unsealed with that officer. The officer then must verify indigency, certify that the materials are legal pleadings or correspondence, and verify that the legal material is actually pertaining to the indigent inmate. OM# 100000–20(c) and (d) (Dfts' Ex. # 2). Ordinarily, postage-paid, outgoing legal mail is sealed by the inmate and may not be searched or detained unless the defendants have a reasonable belief that it contains one of a specified list of illegal contents. OM# 100000–10 (Dfts' Ex. # 2).

34. For inmates in restricted confinement, notary service is obtained by sending the documents to the legal aide office or by requesting the cellhouse caseworker to notarize the documents; no policy requires such notarial services to be performed within any set time period; thus, a notary is not available on a daily basis. (Graham testimony 9/2/83).

35. Inmates in restricted confinement, except inmates on death row (Gall-death row inmate-testimony 9/2/83), are not allowed physical access to carbon paper or a typewriter for security reasons, although they may make request for typing through an inmate legal aide. (Graham-pc inmate-testimony 9/2/83; Ivey-disciplinary seg. inmate-testimony 9/1/83; Reardon-disciplinary seg. inmate-testimony 9/2/83). Parke testified that the inmates have used typewriter parts in the past to fabricate cell keys and knives. (Parke testimony 9/2/83).

36. Inmates in restricted confinement are allowed up to one free copy of two separate cases per weekly request for research purposes, but they have no physical access to digests or law treatises. (Gall &

Ward-death row inmates-testimony 9/2/83). There are complaints of delayed receipt of these copies, unreadable copies, missing pages, and denials of some requests. OM# 100000–22; OM# 060000–02(Q) (Dfts' Ex. # 2; Gall & Ward-death row inmates-testimony 9/2/83; Reardon-disciplinary seg. inmate-testimony 9/2/83).

37. Legal materials kept in the restricted inmates' cells are limited to active cases and a total of five inches of materials. OM# 060000–02; OM# 060000–12 (Dfts' Ex. # 2).

38. All KSP inmates, regardless of indigency, are entitled to two free copies of all documents the legal office supervisor can subjectively identify as a legal pleading and documents to be used as exhibits to legal pleadings. These subjective interpretations have lead to misunderstandings and accusations that Newsome reads all documents to be copied, despite policy safeguards to the contrary. (Ivey; Williamson; Tinsley testimony 9/1/83). It is uncontested that Newsome has erroneously denied inmates access to the copy machine because of his lack of familiarity with institution policy and/or what constitutes an authorized legal pleading, exhibit, or court document. (Ivey testimony 9/1/83; Plfs' Ex. # 8 & 9). Officer Newsome, however, testified that he enforces the policy "very liberally" so long as the inmate demonstrates a legitimate need and is willing to pay for the service. (Newsome testimony 9/1/83). Copies (in excess of two) must be paid for by the requesting inmate (unless the inmate is certified indigent). Copies cost ten cents each, and must be paid for from the inmate's institutional account. (Newsome testimony 9/1/83). No papers, other than legal or court documents may be copied, even if the inmate offers to pay for the service. OM# 100000–20 (Dfts' Ex. # 2).

39. Federal Rule of Civil Procedure 5(a) requires that "every pleading ... shall be served upon each of the parties." Inmate plaintiffs frequently bring civil rights action against multiple defendants and even though, generally, all of these defendants are officials of the Kentucky Corrections Cabinet represented by the same attorney with the agency's Office of General Counsel, each named defendant is entitled under the Rules to his own copy of each pleading served. Since the hearing, however, in the interest of ameliorating this burden, the defendants have agreed to waive the individual service requirement for civil actions in United States district court, and fewer copies are now required for inmate litigants in this court.

40. To qualify as an "indigent" under the terms of defendants' policy, OM# 100000–20, an inmate must have $5.00 or less in his institutional account during the past 30 days. Since security dictates that no inmate is allowed to possess money on his person in the prison, each inmate has an institutional account from which he can draw in order to buy a variety of goods from the canteen, including writing supplies and stamps, and into which friends and family may deposit funds as gifts, and the state monthly deposits the inmate's prison wages. Once indigency is established, the account must be reviewed every week to verify continued indigency status. OM# 100000–20 (Dfts' Ex. # 2).

41. Inmates having filing deadlines established by court order, who do not have sufficient funds in their account for necessary copies and postage, may obtain free copies and postage, if the inmate produces the court order indicating the deadline to the legal office supervisor and the chief clerk's office verifies to the supervisor that the inmate has insufficient funds on his account to pay for the requested copies and postage. The chief clerk's office will place a lien (in the form of a canteen purchase order) on the inmate's account until funds covering the legal costs are posted on the inmate's account; the legal costs shall be deducted from the inmate's account prior to any funds being made available to the inmate for his personal use. OM# 100000–21 (Dfts' Ex. # 2). This policy ignores deadlines imposed under the Federal Rules of Civil Procedure.

42. On August 24, 1983 at least 425 KSP inmates had work assignments and

were on the state payroll. Their compensation ranged from $2.00 per hour to $3.00 per month, depending on their job assignment and grade level. The approximately 80 men in prison industries are paid an hourly rate. OM# 09000–01 (Dfts' Answers to Interrogatories 8/29/83). It is estimated that most inmates earn $12.00 to $15.00 per month. (Ivey testimony 9/1/83). On the same date, the remaining 275 inmates had no work assignments and therefore received the minimum state pay of $3.00 per month. These men are almost exclusively in restricted confinement. (*Id.*; Ward testimony 9/2/83). The uncontraverted evidence shows that state pay is credited to an inmate's account up to 60 days before he is eligible to use the funds for his personal needs because of administrative delays in state fund transfers. (Smith testimony 9/1/83). Under this form of bookkeeping, every inmate may show an accounting balance of over $5.00 in his account, but is unable to spend the money. Parke testified that he was personally unaware of such an accounting delay but could not refute it. (Parke testimony 9/1/83). Examples of such "creative accounting" techniques and the inmates' limited access to their account balances are the source of much of the misunderstanding and bitterness engendered by the defendants' new policy.

43. In the opinion of the inmate witnesses, the personal supplies and hygiene items provided by the state are insufficient, and compel them to spend their own money on these goods and other necessities, such as deordorant and shampoo, which are not provided by the state.

44. As of August 8, 1983, 22 KSP inmates had been certified as indigent. (Dfts' Answers to Interrogatories 8/29/83; Parker testimony 9/2/83).

45. The defendants offered no factual basis for the $5.00 indigency standard and simultaneous sharp curtailment in free legal supplies and services effective June 1, 1983, upon implementation of the KSP policy. In fact, the defendants admit that the standard was arrived at with little or no administrative consideration of the circumstances at KSP, the adequacy of the legal

services program, or its actual cost. (Parke testimony 9/1/83). Despite the fact that the current costs are unknown, the defendants froze inmate access to the photocopier in January 1983 and reduced supplies in an effort to "reduc[e] office supplies expenditures by 50%." (Memo to legal aide supervisor from Parker; Plfs' Ex. # 14). Parker noted that "[t]here has been entirely too many supplies issued to the Legal Aides and the General Population." (*Id.*). When asked at the hearing whether costs have been reduced, neither Parke nor Parker could demonstrate any savings since the defendants have never made a review of the costs of the legal services program. (Parke testimony 9/1/83; Parker testimony 9/2/83). In explaining the intent of the policy, Parke offered only that they had "talked about excessive waste coming out of the legal aide office." (Parke testimony 9/1/83). Parke conceded that much of the problem resulted from a lack of accountability and a lack of any supervision over the program. (Parke testimony 9/1/83).

## II. CONCLUSIONS OF LAW

This court has jurisdiction over this action pursuant to 28 U.S.C. section 1331(a), governing actions arising under the Constitution and laws of the United States and 28 U.S.C. sections 1343(3) and 1343(4), governing actions brought to redress the deprivation of federal rights, privileges, and immunities secured to all citizens and persons within the jurisdiction of the United States.

■ The court is acutely aware of the salutory doctrine that a federal court will not inject itself into the operation of a state prison or scrutinize decisions made by prison supervisors under ordinary circumstances. *Bell v. Wolfish,* 441 U.S. 520, 547–548, 99 S.Ct. 1861, 1878–1879, 60 L.Ed.2d 447 (1979). That doctrine gives way, however, when the constitutional rights of prisoners are either threatened or invaded. *Procunier v. Martinez,* 416 U.S. 396, 404–406, 94 S.Ct. 1800, 1807–1808, 40 L.Ed.2d 224 (1974). Moreover, in this case, the parties have agreed to certain obligations in the

form of a consent decree approved by the court. *Kendrick v. Bland*, 541 F.Supp. 21 (W.D.Ky.1981) (Consent Decree at Appendix 1).

The court must view the Consent Decree as having a dual character; to be treated as a contract for some purposes and as a judicial act for others.[1]

■ Even the best drafted consent decree is likely to be silent as to unforeseen contingencies. In such cases, if the meaning of the provision in dispute is clear from the words alone, the court need go no further; the plain meaning of the words will control. *Roberts v. St. Regis Paper Co.*, 653 F.2d 166, 171 (5th Cir.1981). Generally, reference to extrinsic evidence is permissible only if the order is ambiguous in some respect. *Fox v. United States Dep't of Hous. & Urban Dev.*, 680 F.2d 315, 319–320 (3rd Cir.1982); *Robinson v. Vollert*, 602 F.2d 87, 92 (5th Cir.1979).[2]

In this case, the parties raise issues which are governed in part by the clear unambiguous provisions of the Consent Decree; but in other instances, the Consent Decree is silent or at least ambiguous as to the meaning of the term.

■ In the context of civil rights cases, the purpose of an ambiguous provision should be determined, not only by reference to contractual aids to construction, but also by reference to the constitutional rights sought to be vindicated in the litigation. Relevant here is the body of law interpreting inmates' right to meaningful access to the courts as guaranteed by the Due Process Clause of the Fourteenth Amendment to the United States Constitution. A consent decree is not merely a contract. It is also a court order for in-junctive relief. Moreover, civil rights consent decrees are distinctive in their attempt to protect basic individual liberties. The court must ensure these liberties are not frustrated by an overly narrow construction of the decree. At the same time, the agreement is a compromise; and it would be unfair to the defendants to interpret the words as if the plaintiffs had won a total victory on the merits and were entitled to the maximum relief allowable under the law. *See* Anderson, The Approval and Interpretation of Consent Decrees in Civil Rights Class Action Litigation, 3 *U.Ill.L. Rev.* 579 (1983).

■ The United States Supreme Court recognizes that "[i]t is now established beyond doubt that prisoners have a constitutional right to access to the courts," *Bounds v. Smith*, 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), and that the burden is upon the states to ensure that the right of access remains unfettered. *Bounds v. Smith*, 430 U.S. at 829, 97 S.Ct. at 1498. To meet the constitutional requirement, the right to access must be "meaningful." *Bounds v. Smith*, 430 U.S. at 823, 97 S.Ct. at 1495. " 'Meaningful access' to the courts is the touchstone." *Id.* Under *Bounds,* the right of meaningful access extends to the preparation and filing of actions challenging the fact of a prisoner's confinement as well as to actions challenging the legality of his conditions of confinement. *Bounds v. Smith*, 430 U.S. at 827, 97 S.Ct. at 1497; *see Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (post conviction relief); *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (civil rights).

---

1. *See generally, United States v. Swift & Co.*, 286 U.S. 106, 115, 52 S.Ct. 460, 462, 76 L.Ed.2d 999 (1932) ("We reject the argument of the intervenors that a decree entered upon consent is to be treated as a contract and not as a judicial act."); *United States v. I.T.T. Continental Baking Co.*, 420 U.S. 223, 236–237 n. 10, 95 S.Ct. 926, 934 n. 10, 43 L.Ed.2d 148 (1975) ("Consent decrees and orders have attributes both of contracts and of judicial decrees or, in this case, administrative orders. While they are arrived at by negotiation between the parties and often admit no violation of law, they are motivated by threat- ened or pending litigation and must be approved by the court or administrative agency .... Because of this dual character, consent decrees are treated as contracts for some purposes but not for others. [citations omitted].").

2. *Contra White v. Roughton*, 689 F.2d 118, 120 (7th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 1524, 75 L.Ed.2d 947 (1983) ("a court can properly disregard even unambiguous language when it is convinced that the parties meant something different from what they said.").

In *Bounds*, the Court emphasized that while law libraries are one constitutionally acceptable method to assure meaningful access to the courts, other methods are not foreclosed:

> Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessional and law students, either as volunteers or in formal, clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services officers .... Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.

*Bounds v. Smith*, 430 U.S. at 831–832, 97 S.Ct. at 1499–1500.

Recognizing this right to access to the courts, the question before the court is what type of plan is sufficient, under the factual record developed in this action, to ensure meaningful access to the courts on behalf of inmates at KSR and KSP.

### A. Access to the Prison Law Library/Inmate Legal Aides

As recognized in *Bounds*, acceptable prisoner legal programs may vary widely in their format. But to a greater or lesser degree, dependent upon the circumstances of a particular prison setting, as the court held in *Canterino v. Wilson*, 562 F.Supp. 106, 111 (W.D.Ky.1983), all permissible programs must affirmatively include at least three aspects to meet the *Bounds* standard. First, some source of legal information of a professional nature must be available to all inmates for the full legal development of their claims. This may consist of an adequate law library available to all inmates, qualified persons trained in the law in sufficient number, or some combination of both. Secondly, for those inmates who possess insufficient intellectual or educational abilities to permit reasonable comprehension of their legal claims, provision must be made to allow them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation. Such a presentation does not have to be refined, but it must be reasonable, straightforward, and an intelligible statement. This goal may be accomplished for the unlearned inmate through an institutional attorney, a free-world person with paralegal training, or an inmate, who through adequate training, experience, and intelligence, is a competent "writ-writer." Where these sources of assistance are present, and no physical or coercive restraints to prisoner complaints exist, due process mandating access to the courts is met. Against this standard the court must measure the existing KSR and KSP program.

As an initial consideration, the KSR and KSP plaintiffs challenge the adequacy of the law library and their availability to the prisoners. The issue raised is whether the prisoners are denied meaningful access to the courts because of the limited physical capacity of the prison law library at these respective institutions.

Currently, prison policy limits the availability of the KSP law library to 15 inmates at a time (not counting the 10 authorized inmate legal aides). The KSP plaintiffs seek to expand the capacity of the law library facility to the extent that "[a]ll inmates must have physical access to a law library and law books for at least 16 hours per week." (Plfs' Proposed FOF/COL at 28). The KSR plaintiffs also demand physical access to the library at the LaGrange institution for all inmates, including inmates in segregation. These demands would further require that the "[d]efendants increase the space and equipment available for use in the law library, to comply with professional library standards. The law library will be open daily, including evenings, weekends and holidays." (*Id.*). The KSP plaintiffs also insist that the defendants "employ a full-time, trained professional law librarian." (*Ibid.*) While such a program would be laudable and the defendants are encouraged to explore experimentation that expands physical access

to the law library, every particular of the program sought by the plaintiffs is neither required by the Consent Decree nor a recognized constitutional guarantee.

 Restricted physical access to a prison law library is not a per se denial of access to the courts. A prison library is but one factor in the totality of all factors bearing on inmate access to the courts. The fact that the size of a prison law library permits only a limited number of inmates to use the facility at the same time does not establish the inadequacy of the law library. *Harrell v. Keohane,* 621 F.2d 1059, 1061 (10th Cir.1980) (law library permitted only five inmates to use the office at the same time—the opinion, however, does not indicate the total population of the institution).

 The Constitution does not require that a prison law library be staffed by a professional library scientist. *See Fluhr v. Roberts,* 460 F.Supp. 536, 537 (W.D.Ky. 1978). It is not expected that prisons provide law libraries comparable to those in law schools, and this notion is reflected in the rule that a *pro se* prisoner's pleading is judged under a less stringent standard. *Haines v. Kerner,* 404 U.S. 519, 520, 92 S.Ct. 594, 595, 30 L.Ed.2d 652 (1972).

 Similarly, the Constitution does not guarantee a prisoner absolute physical access to a prison law library. Prison officials are free to reasonably regulate the time, place, and manner in which library facilities are used so long as inmates are assured meaningful access to the courts. *See Fluhr v. Roberts,* 460 F.Supp. 536, 538 (W.D.Ky.1978). *Accord Twyman v. Crisp,* 584 F.2d 352, 358 (10th Cir.1978); *Kirby v. Blackledge,* 530 F.2d 583, 587 (4th Cir. 1976); *Jordan v. Johnson,* 381 F.Supp. 600, 602 (E.D.Mich.1974), *aff'd,* 513 F.2d 631 (6th Cir.1975) (without opinion), *cert. denied,* 423 U.S. 851, 96 S.Ct. 96, 46 L.Ed.2d 75 (1975).

It is uncontested that, with the limited exception of inmates in protective custody (pc), inmates in restricted confinement have no physical access to the respective KSR or KSP law libraries. The plaintiffs insist that this situation contravenes the wording of an agreed order supplementing the Consent Decree which provides "for full access to the law library by all inmates." (12/30/80 Order at section 9) and further violates the inmates' constitutional right of access to the courts.

 The court finds the wording ambiguous to the extent that "full access" may be achieved in theory through either direct physical access to the law library or via the conduit of an adequately trained inmate legal aide. Moreover, the court finds no legal authority to support the plaintiffs' constitutional argument. State authorities may choose alternative avenues to protect a prisoner's right of access to the courts and may constitutionally regulate that right so long as the regulation is reasonable and rationally related to prisoner security. *See generally Holt v. Pitts,* 702 F.2d 639, 640–641 (6th Cir.1983) (denial of physical access to law books to ensure security is not a denial of access to the courts where the prisoner has access to a person trained in the law). *Accord United States v. Chatman,* 584 F.2d 1358, 1360 (3rd Cir. 1978).

 General population and restricted confinement inmates need not be afforded the same legal resources so long as they are afforded meaningful access to the courts. *Nadeau v. Helgemoe,* 561 F.2d 411, 417–418 (1st Cir.1977) (action by 35 pc inmates challenging access to the courts vis-a-vis general population inmates). The facilities and services provided at a state prison to pc and other restricted inmates relative to law library use must be evaluated as a whole.[3] As recognized by the prac-

---

**3.** *Lovell v. Brennan,* 566 F.Supp. 672, 696–697 (D.C.Me.1983) (pc and admin. seg. inmates afforded meaningful access to the courts even though they had no physical access to the law library where an inmate legal aide visited each group weekly and inmates provided with counsel for post conviction relief); *Wojtczak v. Cuyl-*

*er,* 480 F.Supp. 1288, 300–1301 (E.D.Pa.1979) (in light of justifiable security considerations, long-term prison inmate, who was segregated in a pc housing unit at his own request for his own protection, was not entitled to be afforded physical access to the law library where alternate provisions for access to the courts is provided).

tical observation of the First Circuit in *Nadeau,* "[t]he real limitation on the access rights of the pc inmates is the similar rights of the general population, for the two groups cannot use the law library at the same time." *Nadeau v. Helgemoe,* 561 F.2d at 418.

The defendants contend that the law libraries at KSR and KSP, as supplemented by the inmate legal aides and assistance of the OPA attorneys for post conviction relief, are sufficient to provide all inmates at those institutions, including those in restricted confinement, with meaningful access to the courts. In theory this argument is sound; but, as enforced by the defendants at KSP, all prisoners are now denied meaningful access to the courts in violation of not only the express terms of the Consent Decree, section 8, *Kendrick v. Bland,* 541 F.Supp. at 34–35, Appendix I, but constitutional due process guarantees as well. Since the KSR plaintiffs have failed to raise this issue with regard to the LaGrange inmate legal services program, the record is insufficiently developed for the court to determine whether the KSR legal aides and library, considered in their totality, provide the inmates there with meaningful access to the courts.

While some courts have held that law libraries may be sufficient in and of themselves to protect the meaningful access to the courts, the factual record in this case indicates a law library that does not provide the minimum necessary legal resources or adequately trained inmate legal aides as expressly agreed to by the defendants in the Consent Decree. The uncontroverted testimony of Welch, who personally inspected the KSP law library, as supported by the defendants' inventory supervised by Parker, conclusively shows that the law library does not meet the threshold requirement of titles and volumes agreed to in the Consent Decree. *Kendrick v. Bland,* 541 F.Supp. at 34, Appendix I, section 8.

Moreover, the library, even if sufficient, is staffed by an insufficient number of adequately trained inmate legal aides in contradiction to defendants' self-imposed

policy and the terms of the Consent Decree requiring them, through OPA, to offer "a two-week training program .... total[ing] 80 classroom hours" involving "a survey and review" with "instruction in legal research and writing which culminates in a moot court type practice session," in addition to "continuing legal education for legal aides." *Kendrick v. Bland,* 541 F.Supp. at 35, Appendix I, section 8. The existing program offers only 56 hours of instruction, most of which is a videotape presentation with no opportunity for questions and answers, and no continuing legal education was offered until the month before the hearing.

The defendants' policies and procedures governing prisoner access to the courts are premised on the assumption that both the law library and the inmate legal aides meet the minimum standards required by the Consent Decree. The dual deficiencies in these two areas alone constitute at least a breach of the unambiguous terms of the Consent Decree and, on this record, a denial of meaningful access to the courts as explained in *Bounds.*

As previously noted, with the limited exception of pc inmates, inmates in restricted confinement have no physical access to the KSP law library. These inmates are forced to rely upon a system whereby they must seek the limited telephonic counsel of inmate legal aides as supplemented by a limited opportunity to request copies of specific legal materials from their cells via telephone contact to the legal aide office. Absent access to an adequately trained legal aide in the legal aide office, such a system is wholly inadequate to ensure meaningful access to the courts. *Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978). *Accord Cruz v. Hauck,* 627 F.2d 710, 720–721 (5th Cir.1980); *Jones v. Diamond,* 594 F.2d 997, 1024 (5th Cir.1979), *reh'g ordered,* 602 F.2d 1243, *on reh'g,* 636 F.2d 1364 (5th Cir. 1981), *cert. granted,* 452 U.S. 959, 101 S.Ct. 3106, 69 L.Ed.2d 970, *amended, Ledbetter v. Jones,* 453 U.S. 911, 101 S.Ct. 3141, 69 L.Ed.2d 993, *cert. dismissed,* 453 U.S. 950, 102 S.Ct. 27, 69 L.Ed.2d 1033 (1981); *Hooks*

*v. Wainwright,* 536 F.Supp. 1330, 1341 (M.D.Fla.1982).

▇ Unless a satisfactory law library provides access to the courts for *all* inmates, some other assistance must be available for the initiation of post conviction relief and civil rights actions. Because inmates in restricted confinement have no physical access to the law library, the apparent solution afforded by the defendants' plan is prisoner access to inmate legal aides. The unrebutted hearing evidence, however, shows that the inmate legal aides at KSP are not adequately trained as required by the Consent Decree and are therefore limited from performing the function of a "legal assistant," as that term is used in *Bounds v. Smith,* 430 U.S. at 831, 97 S.Ct. at 1499. Moreover, since the attorney employed by OPA at KSP handles only post conviction relief and does not monitor the cases filed by the legal aides, the court can only conclude that the OPA attorney's narrow scope of representation, plus the inmate legal aides' lack of complete training, does not qualify the inmate legal aides at KSP as "paralegal assistants ... work[ing] under lawyers' supervision." *Bounds v. Smith,* 430 U.S. at 831, 97 S.Ct. at 1499. Otherwise, whereas at KSP and KSR there is a tradition of inmate "writ-writers" or "jailhouse lawyers," constitutional access to the courts would require no more than defendants' full compliance with the letter and spirit of the Consent Decree they cooperated in drafting.[4] On this record, however, since prison authorities attempt to provide minimal constitutional access to the courts through the combined resources of inmate law library and inmate legal aides and where the institutional law library does not meet minimum standards and there is insufficient evidence of current training or competence of the inmate legal aides, the state has failed to furnish the necessary alternative means to provide meaningful access to the courts as mandated by the United States Supreme Court in *Bounds.* For example, in *Ramos v. Lamm,* 639 F.2d 559, 582–585 (10th Cir.1980), *cert. denied,* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), *on remand,* 520 F.Supp. 1059 (D.C.Colo.1981), the appellate court sustained the district court finding that inmates were denied meaningful access to the courts where the state's most recent inventory of the prison library's law books showed that volumes were missing throughout its collection of federal decisions and only three inadequately trained inmate legal aides were available to assist inmates at the prison with an inmate population of 1,000.

At the September 1983 hearing, the defendants elicited no evidence substantiating the adequacy of inmate sources of legal information and did not carry their burden of demonstrating that the legal needs of the entire prison population are served by the existent program. The court concludes that the program, as enforced at the time of the hearing, taken as a whole, violates the unambiguous terms of the Consent Decree and does not provide a "constitutionally acceptable method to assure meaningful access to the courts." *Bounds v. Smith,* 430 U.S. at 830, 97 S.Ct. at 1499.

**B. Access to Legal Supplies and Services**

▇ As a component of the state's obligation to ensure meaningful access to the courts, "indigent inmates must be provided at state expense with paper and pen to draft legal documents with notarial services to authenticate them, and with stamps to mail them." *Bounds v. Smith,* 430 U.S. 817, 824–825, 97 S.Ct. 1491, 1496, 52 L.Ed.2d 72 (1977).[5] Plaintiffs contend that the defendants must further provide indigent inmates access to copymachines, typewriters, and notarial services. The defendants agree for the most part. Actually at issue, however, is whether the defendants'

---

**4.** *Cf.* KSP and KSR *with* KCIW (Kentucky's Women's Prison), *Canterino v. Wilson,* 562 F.Supp. 106, 112 (W.D.Ky.1983) (no tradition or evidence of competent "writ-writers" requires assistance of a lawyer).

**5.** *See generally Patterson v. Mintzes,* 717 F.2d 284, 288 (6th Cir.1983) ("'Meaningful' access requires writing facilities and supplies as well as legal resources.").

regulation, OM# 100000–20, defining "indigent" as an inmate "who has received $5.00 or less on his account ... for a period of thirty (30) days prior to the date the indigent certification request is filed," (OM# 100000–20(F)(1)), "impermissibly burden[s] the right of access." *Procunier v. Martinez*, 416 U.S. 396, 421, 94 S.Ct. 1800, 1815, 40 L.Ed.2d 224 (1974).

This issue generated much emotion among prisoners and staff. As a relatively new policy, the indigency standard was poorly received by the inmate population, according to the testimony, and perceived as an obstacle to stiffle prisoner civil litigants.

■ Aside from its emotional context, however, the issue raised by the inmates' challenge is whether the prisoners are denied meaningful access to the courts because some inmates are denied unlimited free access to the photocopier and other legal supplies and services. While the policy may seem unfair compared to past administrative practices, the court does not find that it necessarily denies the prisoners' of their constitutional right of access to the courts, notwithstanding that indigency status may be established for many or most of the class members by the federal district court's grant to proceed *in forma pauperis* in individual civil rights actions.[6] On this record, KSP inmates have not established that the defendants' indigency policy or its enforcement have denied anyone meaningful access to the courts.

In an analogous factual case, an inmate challenged the constitutionality of a prison policy which provided three options for inmate copying of legal materials: (a) use of carbon paper and typewriters available in the law library, (b) forward papers to family and friends to be copied, or (c) reproduction of documents by the institution at a cost of ten cents per copy. Unlike the KSP regulation, the policy made no provision for two free photocopies to all inmates and unlimited free photocopies to indigent prisoners. In upholding the policy as consistent with the prisoners' meaningful access to the courts, the Tenth Circuit held that "[a] prisoner's right of access to the courts does not include the right of free unlimited access to a photocopying machine, particularly when as here, there are suitable alternatives." *Harrell v. Keohane*, 621 F.2d 1059, 1061 (10th Cir.1980) (per curiam).

In *Kershner v. Mazurkiewicz*, 670 F.2d 440 (3rd Cir.1982), the Third Circuit followed the Tenth Circuit's rule, holding "'[t]he constitutional concept of an inmate's right of access to the courts does not require that prison officials provide inmates free or unlimited access to photocopying machinery.'" *Id.* at 445, *quoting, Johnson v. Parke*, 642 F.2d 377, 380 (10th Cir.1981).[7] The court finds no authority to support the plaintiffs' position; but, as incorporated in defendants' policy, "[a]llowing inmates to *pay* for and receive photocopies of legal materials required by the courts is part of 'meaningful access' to the courts that inmates are constitutionally entitled to. [cite omitted]." *Johnson v. Parke*, 642 F.2d at 380 [emphasis added].

---

6. *Twyman v. Crisp*, 584 F.2d 352, 358–359 (10th Cir.1978) (prison policy upheld whereby a prisoner must have less the $5.00 in his prison account to qualify as an "indigent" to obtain free legal supplies).

7. *Accord Wanninger v. Davenport*, 697 F.2d 992, 994 (11th Cir.1983) (per curiam) (jail officials do not necessarily have to provide a prisoner with free, unlimited access to photocopies of legal documents in order to protect the prisoner's right of access to the courts); *Jones v. Franzen*, 697 F.2d 801, 803 (7th Cir.1983) (circuit court reversed district court injunction of state prison authorities photocopying policy); *Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir.1980) (prisoner's allegation that he was denied due process because of a prison regulation restricting the use of the prison library's photocopying machine "baseless"); *Ramos v. Lamm*, 485 F.Supp. 122, 166 (D.C.Colo.1979), *aff'd in relevant part, set aside in part*, 639 F.2d 559, 582–585 (10th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981), *on remand*, 520 F.Supp. 1059 (D.C.Colo.1981) (while inmates have no constitutional right of access to photocopying equipment, adequate access to a photocopy machine might be called for, given the serious restraints on library time and the rule prohibiting inmates from taking legal materials out of the library); *Fluhr v. Roberts*, 460 F.Supp. 536, 540 (W.D.Ky.1978) (Plan for law library services upheld without provision for inmate access to photocopier).

■ To sustain a claim under section 1983 based on denial of copying privileges, an inmate must show that the denial prevented him from exercising his constitutional right of access to the courts. As cautioned by the Seventh Circuit in a similar context, "[t]he reasonableness of a prison's photocopy policy becomes relevant only after the prisoner has shown that the policy is impeding that access, for if it is unreasonable but not impeding he has not made out a *prima facie* case of violation of his constitutional rights." *Jones v. Franzen*, 697 F.2d 801, 803 (7th Cir.1983). The court finds that the plaintiffs failed to demonstrate a *prima facie* case even though the defendants conceded lack of any financial basis for the policy other than their laudable, but factually unsupported, attempt to reduce waste and administrative costs. The inmate photocopy policy at KSP does not offend the Consent Decree or the Constitution.

■ Also in regard to the availability of legal supplies and services, the plaintiffs challenge the unavailability of typewriters and notary service at KSP. Briefly, since prisoners are not prejudiced by the filing of handwritten documents, there is no constitutional right to typewriters. *Twyman v. Crisp*, 584 F.2d 352, 358 (10th Cir.1978); *Stubblefield v. Henderson*, 475 F.2d 26, 26 (5th Cir.1973) (per curiam); *Inmates, Washington County Jail v. England*, 516 F.Supp. 132, 140 (E.D.Tn.1980) ("An inmate has a constitutional right to have access to the courts, a right which includes the right to have paper, pens or pencils. However, that right does not include any constitutionally protected right to have the use of a typewriter. [cites omitted]"), *aff'd*, 659 F.2d 1081 (6th Cir. 1981) (without opinion); *Ramos v. Lamm*, 485 F.Supp. at 166. Similarly, while there may be some delay in having a document notarized by prisoners at KSP, such a delay, without more, fails to demonstrate that access to the courts has been constitutionally abridged by prison officials. *Hudson v. Robinson*, 678 F.2d 462 (3rd Cir.1982) (no denial of access to the courts where an inmate is required to wait 10 days to have a document notarized). Moreover, 28 U.S.C.

section 1746 provides for use in federal proceedings of unsworn declarations given under penalty of perjury in lieu of a notarized signature. *Carter v. Clark*, 616 F.2d 228 (5th Cir.1980) (local rule of federal district requiring notarization of prisoner petition contravenes section 1746 and must be abrogated).

■ As an additional matter, a number of inmates at the hearing complained of having to submit outgoing court and legal correspondence to the defendants as a precondition for free postage. Under prison policy, only court and legal mail is entitled to free postage. OM# 100000–20(D) (Dfts' Ex. # 2). While the defendants contend that they must examine such mail to ensure that it qualifies for free postage, they have been "specifically ... permanently enjoined from censoring any outgoing mail addressed by prison inmates, and from imposing any restrictions on the number of correspondents to whom such outgoing mail may be sent." *Preston v. Cowan*, 369 F.Supp. 14, 25 (W.D.Ky.1973) (class action by Kentucky prisoners successfully challenging mail censorship imposed by enforcement of provisions of 1972 and 1973 Kentucky Department of Corrections' policies), *as modified*, *Ault v. Holmes*, 506 F.2d 288 (6th Cir.1974). Kentucky inmates thus have "an absolute right" to seal and send all outgoing mail without inspection "with the distinct understanding that the inmate will be required to supply his own postage and the expense of mailing any and all correspondence." *Preston v. Cowan*, 369 F.2d at 23. *Accord Guajardo v. Estelle*, 580 F.2d 748 (5th Cir.1978); *Taylor v. Sterrett*, 532 F.2d 462 (5th Cir.1976). Where the state must provide the postage for indigent inmates in order to ensure their access to the courts, however, that absolute right may give way in order to allow the designated legal office supervisor to determine from the outside of the envelope, and if necessary a cursory glance at its contents, that it is a court or legal document destined to a court of competent jurisdiction, employed or appointed legal counsel, or the office of OPA. Generally, an examination of the addressed envelope

alone should provide an experienced layman all the information necessary to determine whether the item qualifies as legal or court mail. For state officials to routinely require more would be a futile waste of scarce state personnel resources needed for institutional security and result in unnecessary delays in the mailing of important documents where the press of court deadlines must be met. When a question arises, however, a cursory look at the contents may be necessary to ensure that the envelope's contents qualify for free postage. The defendants' policy regarding free postage to ensure indigent prisoner access to the courts must be left intact.

An appropriate order is entered today granting the motion of the plaintiffs, in part.

### ORDER

For the reasons given in the memorandum opinion entered today,

IT IS ORDERED AND ADJUDGED:

1. The defendants are in partial violation of the unambiguous provisions of Section 8 of the Consent Decree providing for meaningful access to the courts;

2. To remedy defendants' noncompliance with the terms of the Consent Decree the defendants shall immediately:

a. Make all necessary purchases to maintain a current law library collection as agreed to and ordered by Section 8 of the Consent Decree;

b. Make available ten copies of the Consent Decree, as supplemented to date, in all institutional libraries as agreed to and ordered by Section 1(G) of the Consent Decree;

c. Maintain an adequate law library and office for prisoner use;

d Designate a KSP staff member (new or existing/part-time or full-time), trained or experienced in the law and law library maintenance, to supervise:
i. the inventory of the KSP law library's contents quarterly, with a written status report to the KSP sub-class counsel,

ii. the inmate legal aide staff in the organization and shelving of the prison law library collection, and

iii. legal information services to each housing unit at KSP such that all requests for assistance are reasonably met;

e. Maintain an adequate number of inmate legal aides (not less than 10 at KSP) to reasonably serve the entire prison population and ensure training of the inmate legal aides which meets the requirements of Section 8 of the Consent Decree including, in addition to the basic legal aide (not less than 80 hours), relevant continuing legal education on at least an annual basis;

f. All inmates must have reasonable access (physical or telephonic via the inmate legal aides) to the law library and reasonable opportunity for confidential communication with persons trained in the law (including, but not limited to inmate legal aids, para-legals, or employed or appointed counsel). The defendants shall not unreasonably restrict calls by any inmate to persons trained in the law but defendants may require that such calls be requested on a daily sign-up basis provided opportunity for such calls are afforded as soon as possible but no later than 48 hours from the request.