562 F.Supp. 106 (1983)
Pat CANTERINO, et al., Plaintiffs,
v.
George WILSON, et al., Defendants.
Civ. A. No. 80-0545-L(J).
United States District Court, W.D. Kentucky, Louisville Division.
February 10, 1983.
*107 *108 Susan Deller Ross, Charles Ory, Terisa E. Chaw, U.S. Justice Dept., Civil Rights Div., Sp. Lit. Section, Washington, D.C., Ronald E. Meredith, U.S. Atty., Louisville, Ky., for plaintiff-intervenor.
Walker Bledsoe Smith, David A. Friedman, Anne Marie Regan, Legal Aid Society, Inc., Leslie W. Abramson, Louisville, Ky., Claudia T. Wright, ACLU, Nat. Prison Project, Washington, D.C., for plaintiffs.
Barbara W. Jones, Linda G. Cooper, Gen. Counsel, J. Gary Bale, Frankfort, Ky., for defendants.

MEMORANDUM OPINION
JOHNSTONE, District Judge.
This matter is before the Court on Defendant Kentucky Department of Correction's post-trial motion for supplemental relief from this Court's Order entered on July 26, 1982. A four week bench trial was held and judgment rendered in favor of the plaintiff-class, women inmates at the Kentucky Correctional Institution for Women (KCIW). Canterino, et al. v. Wilson, et al., 546 F.Supp. 174 (W.D.Ky.1982).
At a compliance conference conducted by the Court to settle the litigants' differences on October 13, 1982, two contested issues remained unresolved. First, whether administrators of KCIW must provide attorney-assistance for criminal and civil matters in order to meet their constitutional duty to assure that all inmates incarcerated at KCIW are provided meaningful access to the courts. Second, whether administrators of KCIW have created a constitutionally protected liberty interest in favor of the inmates requiring that a corrections officer may only issue an incident report if he or she personally witnesses an alleged institutional rule infraction. The Court requested the parties submit post-trial memoranda indicating their reliance on trial testimony and the applicable law on these two issues. Because of the length of the trial proceedings, a complete transcript is not available at this writing. However, having thoroughly reviewed the evidence, the memoranda of counsel, and the applicable law, the Court makes the following findings and conclusions.

I. ACCESS TO THE COURTS
Paragraph five of the Court's Order entered July 26, 1982, provides that, in addition to improvements required for the institution's law library:
Defendants [Kentucky Department of Corrections] shall make the services of an attorney available to inmates at KCIW on a part-time basis for at least twenty hours per week.
Defendants' memorandum sets forth the position that the inmates at KCIW have the same legal services as do all Kentucky male inmates in the system. They also state that the Kentucky Office of Public Advocacy (OPA) provides assistance with criminal matters for all Kentucky inmates and that OPA's current practice of providing one attorney to KCIW for one half day every three weeks is adequate to meet the needs of the women. As for civil matters, defendants suggest that the inmates' needs are satisfied by the services provided by inmate legal aides and the institution's recently upgraded law library.
Plaintiffs counter that the defendants have a constitutional duty to provide all KCIW inmates with meaningful access to the courts, which in this case, requires the *109 state to provide attorney-assistance to the inmates in addition to the law library.
This Court's Memorandum Opinion, Canterino v. Wilson, 546 F.Supp. at 216, imposing upon the defendants the duty to provide "... the equivalent of at least one half-time attorney, who will assist inmates in all areas, including habeas corpus and other civil matters, in which they have a demonstrated need...." found such assistance "... required by both the equal protection clause and the decision of the Supreme Court in Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977)."
At trial, this Court found the KCIW law library "woefully inadequate" when the lawsuit was initiated. Canterino v. Wilson, 546 F.Supp. at 203. However, since the filing of this action, defendants are commended for their significant efforts to improve the resources of the KCIW law library. In addition, the availability of the library has been extended to fifteen hours of non-program time per week, the minimum imposed by this Court's Order, July 26, 1982.
Supplementing the law library, the Court found that "[o]ne attorney from the Kentucky Office for Public Advocacy visits KCIW for a half day every three weeks to assist inmates with criminal appeals. This attorney does not assist in civil matters or prison disciplinary proceedings, although most legal problems at KCIW concern civil matters, such as child custody. (Jarvis Testimony)." Canterino v. Wilson, 546 F.Supp. at 203.
The United States Supreme Court recognized "[i]t is now established beyond doubt that prisoners have a constitutional right to access to the courts," Bounds v. Smith, 420 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977), and that the burden is upon the states to ensure that the right of access remains unfettered. 430 U.S. at 829, 97 S.Ct. at 1498. To meet the constitutional requirement, the right to access must be "meaningful." 430 U.S. at 823, 97 S.Ct. at 1495. "`Meaningful access' to the courts is the touchstone." Id. Under Bounds, the right of meaningful access extends to the preparation and filing of actions challenging the fact of a prisoner's confinement as well as to actions challenging the legality of his conditions of confinement. 430 U.S. at 827, 97 S.Ct. at 1497; see Johnson v. Avery, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) (habeas corpus); Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) (civil rights).
In Bounds, the Court emphasized that while law libraries were one constitutionally acceptable method to assure meaningful access to the courts, other methods were not foreclosed:
Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal, clinical programs, the organization of volunteer attorneys through bar associations or other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working either in new prison legal assistance organizations or as part of public defender or legal services offices.... Independent legal advisors can mediate or resolve administratively many prisoner complaints that would otherwise burden the courts, and can convince inmates that other grievances against the prison or the legal system are ill-founded, thereby facilitating rehabilitation by assuring the inmate that he has not been treated unfairly.... Any plan, however, must be evaluated as a whole to ascertain its compliance with constitutional standards.
430 U.S. at 831-832, 97 S.Ct. at 1499-1500.
Recognizing this right to access to the courts, the question before us is what type of plan is sufficient under the factual record developed in this action to ensure meaningful access to the courts on behalf of inmates at KCIW. The defendants contend that the KCIW law library, as supplemented by inmate law clerks and assistance of the once a month visit of the OPA attorney for criminal appeals, is sufficient. This Court disagrees.
*110 While other courts have held that law libraries are sufficient in and of themselves to protect the meaningful access to the courts, the factual record in this case indicates a law library available to some of the inmates only fifteen hours a week under the supervision of inexperienced inmate legal aides is insufficient to provide the inmates with the rights extended to them by the Constitution. These limitations imposed on the use of the library are compounded by the library's physical conditions. The testimony at trial showed that the library has insufficient space, lighting, and study areas, was too noisy, and compared unfavorably to the facility at the men's institution. [Inmate Legal Aide Carol Jarvis Testimony]. The physical deficiencies impede an inmate's ability to use the law library. There are no tables available for research. [Carol Jarvis Testimony]. Generally, protective custody and other inmates in the Cell Block cannot go to the law library. Legal aides must bring books to their cells and each inmate is limited to four law books per day, four days per week. [Testimony of Warden Betty Kassulke, Associate Warden Gail Chandler, and Carol Jarvis]. Some books, such as the Kentucky Revised Statutes and the Criminal Law of Kentucky may not be taken to the Cell Block. [Carol Jarvis Testimony].
These inmates are forced to rely upon a system whereby they must request specific legal materials from their cells. Such a system is wholly inadequate to ensure meaningful access to the courts. Williams v. Leeke, 584 F.2d 1336, 1339 (4th Cir.1978); Accord, Cruz v. Hauck, 627 F.2d 710, 720-721 (5th Cir.1980); Hooks v. Wainwright, 536 F.Supp. 1330, 1341 (M.D.Fla.1982). Unless the library adequately provides access to the courts for all inmates, some other assistance should be available for the initiation of habeas corpus and civil rights actions.
Exacerbating this situation is the fact that many inmates at KCIW are illiterate or otherwise unable to do effective legal research. Plaintiffs' Exhibit 5 imports that 69% of the KCIW population had less than a high school education, with half of the total population having completed only the eighth, ninth or tenth grades. This is corroborated by Table II of Plaintiffs' Exhibit 6 and Defendants' Exhibit 103.
Even if unlimited physical access could be provided to the law library, it would be unavailing to one who lacks sufficient opportunity or intellectual ability to utilize the facility. The facts indicate that this is the case at KCIW.
The unrebutted trial testimony shows that the inmate legal aides at KCIW cannot effectively perform the function of a legal assistant, as that term was used in Bounds v. Smith, 430 U.S. at 831, 97 S.Ct. at 1499. No comprehensive paralegal training is given, only a training course limited to legal research. [Carol Jarvis Testimony]. However, that course did not attempt to teach the sort of research and writing skills necessary to prepare legal briefs. The emphasis of the training was on criminal cases, with only films used to train inmates on civil matters. No continuing legal education seminars are conducted after the initial training. Since the attorney from OPA handles criminal appeals only and does not monitor the cases filed by the legal aides, it appears that the OPA attorney's narrow scope of representation and supervision, plus the clerks' lack of serious training in civil matters, do not qualify the inmate law clerks as "paralegal assistants ... work[ing] under lawyers' supervision." Bounds v. Smith, 430 U.S. at 831, 97 S.Ct. at 1499.
As defendants point out, the OPA attorney's services are limited by statute to provide only for "the representation of indigent persons accused of crimes or mental states which may result in their incarceration or confinement." K.R.S. 31.010. The November, 1982, affidavit of David Norat, OPA attorney servicing KCIW, provides that he does not "... undertake representation of inmates in civil actions other than in petitions for writs of habeas corpus and other civil cases directly relating to the challenge of a criminal conviction or a sentence." While OPA may be prohibited by *111 statute from assisting the inmates at KCIW on legal matters such as civil rights actions, the OPA is not the only source of attorney-assistance available to the defendants to provide counsel for these inmates.
Even this limited access to the OPA attorney afforded the KCIW inmates is less than that afforded to similarly situated male inmates in the Kentucky Prison System. The proof at trial indicated a denial of equal protection. We found, in our Memorandum Opinion of July 26, 1982, "KSP [Kentucky men's maximum security prison] has three full-time attorneys serving around 900 inmates," or one attorney hour per about seven inmates per week. Canterino v. Wilson, 546 F.Supp. at 203. "KSR [Kentucky men's medium security prison] has two full-time attorneys and one part-time, serving 1500 inmates a total of 96 attorney hours per week," or about one attorney hour per fifteen inmates per week. Id. There are about 150 women inmates incarcerated at KCIW. The state offered no basis for providing the women at KCIW with only one attorney hour per 150 inmates per week. The state has failed to show how such a disparity in access to the courts is justified. Glover v. Johnson, 478 F.Supp. 1075, 1079 (E.D.Mich.1979).
As recognized in Bounds, acceptable legal services programs may vary widely in their format. But to a greater or lesser degree, dependent upon the circumstances of a particular prison setting, it has been held that all permissible programs must affirmatively include at least three aspects to meet the Bounds standard. First, some source of legal information of a professional nature must be available to all inmates for the full legal development of their claims. This may consist of an adequate law library available to all inmates or qualified attorneys in sufficient number, or some combination of both. Secondly, for those inmates who possess insufficient intellectual or educational abilities to permit reasonable comprehension of their legal claims, provision must be made to allow them to communicate with someone who, after consultation with the legal learning source, is capable of translating their complaints into an understandable presentation. Such a presentation does not have to be refined, but it must be reasonable, straightforward, and an intelligible statement. This goal may be accomplished for the unlearned inmate through an institutional attorney, a free-world person with paralegal training, or an inmate, who through experience and intelligence, is a competent "writ-writer." Where these sources of assistance are present, and no physical or coercive restraints to prisoner complaints exist, due process mandating access to the courts is met.
Against this standard we measure the existing KCIW system.
Regarding a source of legal information, we find that the KCIW law library is now or is currently in the process of meeting the standards set out in this Court's Order entered July 26, 1982. However, the provision of a satisfactory law library does not settle the issue. As it is recognized in this Circuit, "... Defendants' position that they are obligated only to provide either an adequate law library or qualified legal assistance is too narrow a reading of Bounds. [Judge Feikens's emphasis]" Glover v. Johnson, 478 F.Supp. 1075, 1096 (E.D.Mich.1979).
Faced with a similar issue in considering the constitutionality of conditions at the women's correctional facility in Michigan, Judge Feikens noted in Glover v. Johnson that "[t]he adequacy of a prisoner's rights to access to the courts must be measured by the actual opportunity he or she has to raise a valid and meaningful claim before the courts." The United States Supreme Court recognized in Wolff v. McDonnell, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974), that the Due Process Clause assures that no person will be denied the opportunity to present to the judiciary allegations concerning violations of fundamental constitutional rights. "The recognition by the Court that prisoners have certain constitutional rights which can be protected by civil rights actions would be diluted if inmates, often `totally or functionally illiterate,' were unable to articulate their complaints to the courts." Id. at 579, 94 S.Ct. at 2986.
*112 It does not necessarily follow that the presence of a few inexperienced inmate legal aides at KCIW fulfill the constitutionally necessary translator to provide the metamorphosis for an inmate's pro se complaint into an understandable legal presentation. Historically, women inmates have not gained the experience of their male counterparts in providing legal assistance to other inmates as "writ-writers" or "jailhouse lawyers" because of the unavailability for many years of sufficient legal resources. Glover v. Johnson, 478 F.Supp. at 1097. As noted, at the time of the filing of this action, the KCIW law library was "woefully inadequate." Canterino v. Wilson, 546 F.Supp. at 203. The actions pending before this Court reflect the absence of effective inmate writ-writers at KCIW in comparison to the State's male institutions.
Defendants cannot reject the responsibility impressed upon them by the Constitution that they shall "... assist inmates in the preparation and filing of meaningful legal papers....," Bounds v. Smith, 430 U.S. at 823, 97 S.Ct. at 1495, on the grounds that men do not share the same opportunity. The services of an attorney is justified, not because there is or is not a similar program offered at the men's prisons, but because, unlike the male population generally, the women do not have a history of self-help in the legal field; the evidence tends to show that until recently they have had little access to adequate legal resources. At trial, defendants elicited no evidence substantiating the adequacy of its legal assistance program and did not carry its burden of demonstrating that the legal needs of the prison population are served by the existent program. Until the goal of meaningful access is reached, the defendants are charged with the responsibility of formulating a plan, compatible with security objectives, which will ensure that inmates needing assistance will have access to competent assistance.
Since trained inmate writ-writers are not available, such a plan, of course, must in some way provide for identification of either paid or volunteer attorneys or paralegal advisors within the meaning of Bounds, and it must also create a method whereby the inmate-plaintiff and advisor can meet together.
Based upon this Court's findings of fact at trial, the Court concludes that the program in effect at the time of trial as modified to date for providing KCIW inmates with legal assistance, taken together, does not provide a "constitutionally acceptable method to assure meaningful access to the courts." Bounds v. Smith, 430 U.S. at 830, 97 S.Ct. at 1499. We adopt the language of the Court's Memorandum Opinion and Order entered July 26, 1982, where it provides:
To bring access to courts to constitutional parity, defendants must 1) supply a library equivalent to those required for males at KSP and KSR, 2) substantially increase the amount of non-program time the library is open, and 3) provide the equivalent of at least one half-time attorney, who will assist inmates in all areas, including habeas corpus and other civil matters, in which they have a demonstrated need.
Canterino v. Wilson, 546 F.Supp. at 216.
Finding nothing indicating defendants are not in compliance with the first two elements of the Court's mandate, we leave to the parties the task of formulating the precise details within today's guidelines to accomplish the third element necessary to afford inmates at KCIW their fundamental constitutional right to meaningful access to the courts.

II. INCIDENT REPORTS
Paragraph four of the Court's Order in this action provides:
Defendants are directed to distribute to each inmate brought before the Adjustment Committee a document explaining in plain language the inmate's minimum due process rights which are embodied in defendants' Internal Management Directives. This document shall be served on inmates at least twenty-four hours prior to their Adjustment Committee hearing.
*113 Defendants, by their Motion for Supplemental Relief, dated September 17, 1982, sought to avoid this requirement contending it creates a "substantial burden" and is "unnecessary and not required by law or the Consent Decree or the Internal Management Directives."
On the other hand, plaintiffs respond that such a document is essential to ensure that each residents' due process rights are protected.
At a conference conducted by the Court on October 13, 1982, the parties agreed that, except for one contested provision, the plaintiffs' tendered document: "Inmate Rights  KCIW Disciplinary Procedures," Exhibit "A" to Plaintiffs' Response to Defendants' Notice of Compliance, should be adopted in its entirety to meet the requirement of paragraph four of the Order. The contested subsection provides:
§ I.B. A CO [corrections officer] may only issue a write-up if he or she personally witnessed the incident.
This Court, in its Memorandum Opinion, interpreted Internal Management Directive (IMD) 713.03(D)(1) as requiring incident reports to include only facts personally witnessed by the reporting corrections officer. Canterino v. Wilson, 546 F.Supp. 174, 202 (W.D.Ky.1982). IMD 713.03(D)(1), Exhibit PX-22, specifically limits the issuance of incident reports to "... only those facts which the reporting employee has personally witnessed and otherwise verified...." [emphasis added]. The Court concluded this directive governed the issuance of all incident reports on the trial testimony of Gary Dennis, Executive Director of the Office of Corrections Training. [Defendants attached the partially transcribed portion of his trial testimony as Exhibit 1 to their post-trial memorandum]. At page 4 of Exhibit 1, Mr. Dennis testified:
We go over with them [corrections officers] the Incident Report. We talk with them about the importance of report writing and the fact that they are only to report what they see. They are not to deal with hearsay.
From the trial testimony, this appears to be a blanket requirement limiting the discretion of all corrections personnel, except in the case of an "extraordinary occurrence." Mr. Dennis, at page 5 of Exhibit 1, explained the difference between an "incident report" and an "extraordinary occurrence report."
We talk about two different kinds of reports. We have an incident report which is an Adjustment Committee action. We teach the employees to fill that out if there [is] an infraction of the code of conduct or the rules or regulations. There is another incident report called or sometimes referred to [as] an extraordinary occurrence report which is filled out. These are quite different. The incident report, that is where we teach our line staff members you report only what you see. Then that is turned over to the next [line] of supervision which is probably [a] lieutenant for investigation.
....
So we teach our line correctional officers, the new employees, your responsibility is [to] report only what you see, write in that report factual information and then that report is passed up to the next level of supervision and they will undertake the investigation. That is in an instance where there is [a] violation of the code of conduct. [emphasis added].
Even in a situation where an inmate might repeatedly say or do something disruptive, yet no staff member personally witnesses the act, Mr. Dennis explained at page 6-7 of Exhibit 1:
... we teach them they are not to take action on hearsay. That they are only to write reports when they charge an inmate with an offense that they have first hand knowledge of. They are not to take another inmate's testimony or another inmate's word that "X" called him an SOB.
Gary Dennis went on to explain, at page 6 of Exhibit 1, that in a situation where no officer witnesses a serious incident, such as a "cutting" incident,
... we would instruct our officer there to do an extraordinary occurrence report. *114 Which means at this particular point in time you are not charging any inmate with an offense under the offense and penalty code. All you are doing is describing what is an extraordinary occurrence. Whether it is a cutting or a fire or something that would bear investigation.
....
We would teach them to write a full description of the incident of what they saw. I want to make a clear distinction that in that case they are not charging an inmate with a violation. All they are doing is reporting the circumstances of that event. [emphasis added].
Thus, the policy governing the write-ups of an extraordinary occurrence report, where there is a serious offense committed and a full investigation verifying the event, even in the absence of a corrections officer personally witnessing the event, provides for charges to be brought against an inmate, not on the basis of the incident report alone, but upon the staffs' thorough investigation and the recommendation of an administrative officer. As KCIW Warden Betty Kassulke testified, extraordinary occurrence reports issue for fires, escapes, serious injuries, accidents, and similar incidents. Plaintiffs agree with this dichotomy distinquishing incident reports and extraordinary occurrence reports.
It is recognized in this Circuit that state policy limiting prison officials' discretion creates an enforceable liberty interest. Bills v. Henderson, 631 F.2d 1287 (6th Cir. 1980); Walker v. Hughes, 558 F.2d 1247 (6th Cir.1977). In addressing the issue of an inmate transfer into segregation, the Sixth Circuit stated that a "[l]iberty interest can be created by state rules or mutually explicit understandings as well as by statute." Bills v. Henderson, 631 F.2d at 1291.
In this action, the record reflects that the Kentucky Department of Corrections, through IMD 713.03(D)(1), Exhibit PX-22, has created such a liberty interest as set out above. The testimony of Gary Dennis confirms that this policy is applicable to all corrections officers.
As noted, it has been the state's policy that all incident reports shall issue only where a corrections officer personally witnesses the incident. In the case of an extraordinary occurrence, such as an escape, murder, extortion, fire, or similar serious violation of institutional rules or law, the Department indicates that, regardless of whether there is a staff witness, a full investigation shall be conducted verifying, documenting, and substantiating the incident, and upon the recommendation of administrative personnel, specific charges identifying the alleged infraction shall be brought against an inmate in the form of an "extraordinary occurrence report." The Court recognizes that the Administrators of the Kentucky Corrections Department must be allowed to issue charges of serious institutional infractions based on a thorough investigation since they cannot operate and maintain security otherwise. However, as to violations of prison conduct code, the Department requires all write-ups to be personally witnessed by a corrections officer. The defendants have offered no trial testimony or exhibits to the contrary.
On the basis of the record, exhibits, and trial testimony, the Court finds that the existing policy of the Department of Corrections might be better stated as follows:
Where there is a violation of the prison code of conduct, a corrections officer may only issue an incident report if he or she personally witnessed the incident pursuant to IMD 713.03(D)(1);
However, in the event of a serious inmate infraction (e.g., murder, fire, extortion, escape) a corrections officer need not personally witness the incident, but upon a thorough staff investigation verifying, documenting, and substantiating the acts or events involved in such an infraction, charges may be brought upon the recommendation of an administrative officer in the form of an extraordinary occurrence report.

The Department of Corrections current policy reflects an attitude of professionalism by the administrators and staff in their attempt to maintain the delicate balance *115 between institutional security and fairness to the inmate charged with a rule infraction.
An appropriate order is this day entered.

ORDER
For the reasons stated in the Memorandum Opinion this day entered,
IT IS ORDERED:
1. The parties shall submit a plan formulating the precise details to assure inmates at KCIW their fundamental constitutional right to meaningful access to the courts. Supplementing the changes previously mandated by this Court's Order of July 26, 1982, enlarging the KCIW law library and expanding its availability, this plan shall specifically provide for identification of either paid or volunteer attorneys or paralegal advisors within the meaning of Bounds v. Smith, 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), who will assist inmates in all areas, including criminal actions, habeas corpus and other civil matters, in which the inmates have a demonstrated need. By necessity, this plan will incorporate the available services afforded by the Kentucky Office of Public Advocacy, but will not be limited to that agency in fulfilling the state's constitutional responsibility. The plan must also create a method whereby the inmate plaintiff and advisor can meet together. Within the guidelines set out in the Memorandum Opinion, we leave to the parties the task of formulating the precise details of the plan.
The plan shall be submitted within sixty days of this Order.
2. As agreed and modified by the parties at a conference conducted by the Court on October 13, 1982, plaintiffs' tendered due process document: "Inmates Rights  KCIW Disciplinary Procedures," Exhibit "A" to Plaintiffs' Response to Defendants' Notice of Compliance, shall be adopted in its entirety. However, while § I.B., as tendered, adequately addresses defendant's policy for verification and issuance of an "incident report," it does not address its policy for verification and issuance of an "extraordinary occurrence report" and the parties may supplement the wording of that section to clarify any ambiguity created by that omission.
As agreed by the parties, the due process document shall be incorporated verbatim into the new KCIW resident handbook for distribution to all inmates. However, until the information can be incorporated in the handbook, the document shall be given to the charged inmate at least 24 hours prior to the Adjustment Committee hearing.
This requirement shall become effective as soon as possible, or no later than ten days from the entry of this Order.