Terrell **WALTERS, Joseph Ganci, and all others similarly situated, Plaintiffs,**

v.

**Governor James THOMPSON, Michael Lane, Daniel C. Bosse, J.W. Fairman, Henry E. Cowans, Marvin D. Shields, Donald Cartwright, James Thieret, James Chrans, Michael O'Leary, Jim Edgar, and Peter E. McElhinney, Defendants.**

**No. 82 C 1920.**

United States District Court,
N.D. Illinois, E.D.

Aug. 8, 1985.

Shelly Bannister, Margaret Byrne, Bannister & Byrne, Alan Mills, Uptown Peoples Law Center, James P. Chapman, James P. Chapman & Associates, Ltd., Chicago, Ill., for plaintiffs.

Joseph F. Spitzzeri, Asst. Atty. Gen., State of Ill., Neil F. Hartigan, Atty. Gen., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs Walters and Ganci are inmates in the segregation units of the Menard Correctional Center and the Joliet Correctional Center, respectively. They claim that defendants have denied them meaningful access to the courts. The focus of their complaint is two policies of the State Department of Corrections. First, plaintiffs allege that they have no physical access to their prison law libraries. Second, they also challenge the adequacy of the training, supervision and support given inmate clerks who provide plaintiffs with indirect access to the law libraries.

This case has had a somewhat curious history. It was originally brought *pro se* by Walters, raising five claims. Three were dismissed early in 1984, leaving two issues relating to legal research and legal papers pending. Thereafter Ganci joined as a plaintiff and they sought to represent a class restricted to the Joliet Correctional Center segregation unit. Walters was thereafter transferred to Menard, and counsel subsequently broadened the attack to include other segregation units in the state system.

The plaintiffs now seek to bring this action on behalf of a class of adult inmates housed in the segregation units of Illinois' maximum security institutions, who allegedly are being denied meaningful access to the courts as a result of defendants' policies. Plaintiffs seek injunctive relief on behalf of themselves and the class, and damages on behalf of themselves. Before the court are motions for class certification, for issuance of a preliminary injunction on the pleadings, and several subsidiary motions.

## CERTIFICATION OF CLASS ACTION

■ The class certification decision is made without reference to the merits of the case. Plaintiffs bear the burden of establishing the suitability of a class action. *Eggleston v. Chicago Journeymen Plumbers Local Union No. 130*, 657 F.2d 890, 895 (7th Cir.1981), *cert. denied* 455 U.S. 1017, 102 S.Ct. 1710, 72 L.Ed.2d 134 (1982). There are four prerequisites to the maintenance of a class action under Rule 23 of the Federal Rules of Civil Procedure. First, the class must be so numerous that joinder is impractical. Second, there must be issues of fact or law common to all class members. Third, the claims or defenses of the representative parties must be typical of those of the class. Fourth, the plaintiffs must be a fair and adequate class representative. *See generally Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346, 1349 (7th Cir.1982).

### A. Numerosity

The proposed class easily satisfies the numerosity requirement. While discovery is not complete, it is evident that hundreds of inmates are housed in segregation units at all times (pl. reply brief, exh. 7). Further, a substantial proportion of those inmates housed in segregation stay there for lengthy periods (*id.* exh. 8). Finally, it may be appropriate to include future inmates in class actions challenging prison conditions, *see Ahrens v. Thomas*, 570 F.2d 286, 288 (8th Cir.1978), further increasing the size of the class. Even if the size of the putative class is discounted by the percentage of inmates not involved in legal proceedings, the number of inmates in the class is still substantial. Moreover, it is improper to limit the class to only those inmates currently pursuing legal actions. Inmates who have a claim but are unable to formulate a complaint due to restrictions on their access to legal materials are as much denied meaningful access to the courts as inmates who are already involved in a lawsuit.

### B. Common Questions of Law and Fact

The commonalty requirement is satisfied by a question of law or fact common to all class members. *Faheem-El v. Klincar*, 600 F.Supp. 1029, 1037 (N.D.Ill.1984). This case presents two interrelated and overriding common questions: first, whether preventing segregated inmates from having direct physical access to the law library denies them meaningful access to the courts and, second, whether the systematic reliance on inmate clerks to provide segregated inmates with indirect access to the law library is a constitutionally adequate substitute for direct access to the law library.

Plaintiffs' case is very simple. It rests on the position that defendants have denied segregated inmates meaningful access to the courts by failing to provide either direct access to the law library or any of the alternatives to direct library access outlined in *Bounds v. Smith*, 430 U.S. 817, 97

S.Ct. 1491, 52 L.Ed.2d 72 (1977). Thus, defendants' argument that the length of time an inmate spends in segregation may determine whether meaningful access has been denied is well taken but premature. At this point plaintiffs are arguing that for any period both the denial of direct library access and the reliance on ill-trained inmate clerks are constitutionally repugnant. If, after discovery, this position is shown to be too ambitious, this court has sufficient discretion to tailor the class.

■ Similarly, it appears that segregated inmates in some facilities such as Stateville and perhaps Menard may have some, albeit limited, access to the prison library. Plaintiffs, however, complain that even inmates in these institutions do not have open stack privileges but must rely upon a guard to bring books to them in a cage built in the library. They also complain that the administration of the library systems in these institutions is characterized by favoritism and inefficiency, severely curtailing library access for some inmates. Factual differences do not doom a class action where there is a common legal question faced by all class members. Here, the particulars of each segregated inmate's access to legal resources falls into several easily discernible institutional patterns and these patterns in turn present common legal questions. If necessary, the scope of the class can later be limited. While the factual development of conditions at Stateville and Pontiac is sketchy, the defendants have made it evident that the systems have substantial similarities and are responsive to departmentwide policy.

### C. Typicality

■ The typicality requirement is satisfied if the named representative's claims have the same essential characteristics as the claims of the class at large. *De La Fuente v. Stokely-Van Camp, Inc.*, 713 F.2d 225, 232 (7th Cir.1983). Plaintiffs claim they are being denied meaningful access to the courts by defendants' refusal to provide them with direct access to the prison libraries and by defendants' use of allegedly ill-trained, inadequately supervised, outnumbered, and dependent inmate law clerks. This legal theory is common to all members of the class and overrides any factual distinctions between the claims of the plaintiffs and those of the class members. *Id.*

### D. Adequacy of Representation

The adequacy of the class representative "turns on the proposed representative's interest in the outcome and the capability of his counsel." *Lewis v. Tully*, 99 F.R.D. 632, 644 (N.D.Ill.1983). Plaintiffs have every likelihood of being confined in segregation until well after the conclusion of even the most protracted lawsuit. Their pursuit of this lawsuit will alone ensure that they share an interest with other inmates in segregation in seeking greater access to legal resources. Plaintiffs' counsel are obviously capable.

### E. Preclusive Effect of Other Cases

Defendants also argue that class certification is inappropriate here because plaintiffs' claims have been or are being addressed in other litigation. In *Hanrahan v. Lane*, 80 C 2982 (N.D.Ill. 12/21/84), Judge Leighton ruled that inmates had not established that conditions at Joliet Correctional Center constituted cruel and unusual punishment. The *Hanrahan* decision, however, did not address the access to prison library issue. *Wren v. Lane*, No. 83 C 2382, pending before Judge Baker in the Central District of Illinois, attacks delays facing general population inmates who seek access to the prison library. This case, in contrast, involves inmates in segregation who have no right of direct access to the library and must rely exclusively upon inmate clerks.

*Shango v. Jurich*, No. 74 C 3598, pending before Judge Shadur, involves the Stateville institution and more closely covers the issues raised in this lawsuit. Though the precise claims raised by plaintiffs here have not been raised in *Shango*, one issue being litigated in that case is whether the operation of the prison library

effectively denies segregated inmates meaningful access to the courts.

The similarity between *Shango* and this case is insufficient to bar class certification. First, defendants have not filed a motion for relatedness or consolidation. Second, *Shango* is directed at a single institution while plaintiffs' complaint is directed against all Illinois maximum security prisons. In fact, Judge Shadur has refused to extend to Menard the terms of a consent decree that covered some of the access to court issues raised in *Shango*. Third, Walters and Ganci are not members of the *Shango* class and thus have no opportunity to litigate their somewhat different claims. *See Madyun v. Thompson,* 657 F.2d 868, 871–72 (7th Cir.1981). In sum, the *res judicata* effect of *Wren* and *Shango,* if any, is best determined after those courts have ruled on the merits.

**F. Rule 23(b)(2) Class**

■ A class may be certified under Rule 23(b)(2) of the Federal Rules of Civil Procedure if

> the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the class as a whole.

This case easily falls within Rule 23(b)(2). It is a challenge to policies of denying segregated inmates direct access to the law library and of relying upon allegedly ill-trained and outnumbered inmate law clerks. The relief sought for the class is injunctive. While plaintiffs seek damages, this alone does not preclude class certification because the relief sought for the class is solely injunctive. *Lewis v. Tully,* 96 F.R.D. 370 (N.D.Ill.1982).[1]

■ Accordingly, this court certifies a class of persons who are presently or will be in segregation in the maximum security facilities of the Illinois Department of Corrections.

**PRELIMINARY INJUNCTION**

**A. Introduction**

Plaintiffs seek issuance of a comprehensive preliminary injunction ordering defendants to

(a) ... keep the plaintiffs in an institution close to Chicago, prohibit their transfer away from this institution except by court order, provide them with telephone access to counsel, allow them to meet privately with attorneys and witnesses, and permit them access to the law library;

(b) ... refrain from transferring to another institution Richard Baker, the only trained inmate clerk working at the Joliet Correctional Center;

(c) ... establish a comprehensive training and continuing education program for all inmate clerks and to provide lawyers independent of the defendants to supervise the inmate clerks and to provide direct representation when necessary.

■ In order to obtain a preliminary injunction plaintiffs must establish (1) at least a reasonable likelihood of success on the merits; (2) no adequate remedy at law and the prospect of irreparable harm; (3) the threatened injury outweighs the threatened harm the preliminary injunction will cause the defendants; and (4) the granting of the preliminary injunction will not disserve the public interest. *Godinez v. Lane,* 733 F.2d 1250, 1257 (7th Cir.1984), *but see Roland Machinery Co. v. Dresser Industries, Inc.,* 749 F.2d 380, 382–83 (7th Cir.1984) (outlining as many as six prerequisites). Plaintiff has the burden of proving each of these factors. *Dos Santos v. Columbus-Cumeo-Cabrini Medical Center,* 684 F.2d 1346, 1349 (7th Cir.1982).

**B. Facts**

Defendants have not contested the facts as alleged by the plaintiffs and supported

---

1. Defendants have moved to strike exhibits 2 and 9 to plaintiffs' reply brief in support of the motion for class certification. Because the court did not rely upon these two exhibits in deciding to certify the class, it need not consider the merits of the motion.

by affidavits, although some of the matters are denied in an unverified answer. The record shows that when Ganci was placed in segregation at Joliet on April 21, 1983, he was attempting to defend himself in a criminal action and to mount a civil rights challenge to institutional conditions (Ganci I, p. 1).[2] Despite repeated requests he has been denied direct access to the law library (*id.* at 2). Walters was transferred to the segregation unit of Joliet on March 18, 1982 (Walters I, p. 1). At that time he was defending himself in a criminal action and was pursuing two civil rights actions (*id.*). Despite repeated requests Walters was denied physical access to the library (*id.* pp. 2–3). Since June 4, 1984 Walters has been housed at Menard and has been denied significant access to its law library, despite repeated requests (*id.* at 5, *see also* Walters III and IV).[3]

At Joliet, plaintiffs, like the inmates in segregation, relied upon a system of inmate library clerks for their "access" to the law library (Ganci I, p. 2; Walters I, pp. 4–5). Affiant Baker is one of these clerks. He testified that the Joliet library is staffed by two full-time and one part-time employees of the Bur Oaks Regional Library System (Baker, p. 1). These civilian employees have a wide variety of duties, have no regular or structured access to lawyers, and apparently play no direct role in assisting actual or potential inmate litigants (*id.* pp. 1–2). The Joliet law library is also staffed by two inmate clerks and two inmate trainees (*id.* p. 2). Baker, who like the other clerks has only a high school education, is the only clerk who received any training for the job (*id.*). He attended a 15-session training program which covered the rudiments of the law and legal re-

search but failed to cover some essentials, including, rather incredibly, habeas corpus (*id.*). The other clerks learn primarily from on-the-job experience (*id.*). There is no continuing education program for clerks (*id.* p. 4). The clerks, like the civilian library employees, have no regular or structured access to lawyers (*id., see also Clements*).

During the ten hours the Joliet library is open daily the clerks interview inmates who have legal questions or problems (Baker, p. 2). Because 90 per cent of the inmates are not able to do their own research or writing, the clerks must research the applicable law and draft the appropriate documents (*id.*). The clerks also photocopy cases, type legal documents, and perform similar clerical tasks (*id.*).

Joliet has over 1200 inmates and the staff of inmate clerks is insufficient in numbers and training to meet their legal needs (Baker, pp. 2–4). The clerks must assist inmates on three types of cases. First, many inmates have criminal cases pending and must have access to a library on a priority basis to meet court-imposed deadlines (Baker, p. 2). Second, many inmates who bring civil actions *pro se* need assistance (*id.* pp. 2–3). Third, inmates who institute internal grievances or must defend themselves against internal disciplinary charges often need access to legal materials (*id.* p. 3).

Until mid-1981 Joliet inmates in segregation had physical access to a law library (Baker, p. 3). Specially designed facilities which are still in place gave segregated inmates access to case reporters, statutes, and other legal materials while still isolating them from contact with regular inmates (*id.*).[4] Since then prisoners in segre-

---

**2.** The citations are to the affidavits attached to plaintiffs' reply brief in support of a preliminary injunction on the pleadings and their brief in support of their motion for an expedited ruling.

**3.** In his most recent affidavit Walters described the extremely limited research assistance given Menard inmates who use the library (Walters IV). Library visits average one hour (*id.* p. 2). Inmates are put in cages and do not have stack privileges (*id.*). While inmate library clerks will bring specifically requested materials to the

cage inmates they provide no research assistance (id. *see also* 2/1/85 Archibald Aff.).

**4.** In July 1984 defendants began dismantling these facilities. The parties have agreed, however, that no further dismantling would take place until this court issued its ruling (Exh. N, Mot. for Expedited Ruling). In light of this court's opinion that status quo should be maintained until there has been a hearing on the scope of injunctive relief.

gation units have been denied access to the library (*id.*). Instead, the inmate clerks visit the segregation unit up to three times weekly, but frequently less often (*id.*). Under the supervision of one of the civilian employees the clerks interview the inmates, take their requests for legal materials, review documents drafted for them and offer advice (*id.*). The clerks then return to the library to do the requested research or drafting and must wait to meet with the inmate until the next "round" (*id.*).

The clerks are prohibited from bringing legal materials to the segregated inmates from the library (Baker, p. 3). Rather, the clerks must photocopy the legal materials requested by the inmates (*id.*). Inmates, however, are limited to 300 free copies a year (Walters I, p. 3). Plaintiffs testified that this limit forces them to curtail their requests for copies of legal materials, thus impeding their own legal research and forcing increased reliance upon the inmate clerks (*id.*).

The most recent uncontradicted affidavits offered by the plaintiffs indicate that defendants have put the integrity and effectiveness of this rudimentary legal assistance system under severe stress. First, following the November 1984 food strike two inmate law clerks were placed in segregation for fourteen days (Strong, Clements). They were accused of having given inmates advice on how to draft grievances concerning the food quality (id.). Second, soon after the food strike two inmate clerks were transferred to another institution (Strong, p. 2) and since the food strike there has been a high turnover of clerks within Joliet (Clements, pp. 2–3: Ganci III, p. 2). The frequency and quality of service provided by inmate clerks has dropped accordingly (id.). Third, beginning on November 1, 1984 the Department of Corrections replaced the regional library systems as the employer and supervisor of the inmate law clerks. The immediate effect of this switch was a reduction in the wages

and hours of inmate clerks, further limiting services (Exh. S). Moreover, as a result of the change inmates are increasingly unwilling to confide in inmate clerks for fear that the Department of Corrections will pressure the clerks to disclose the information (Strong). The Department has also pressured the clerks not to help inmates pursue grievances in suits against the Department (id.).[5]

Inmates in segregation have no access within the institution to attorneys, law students or trained paralegals (Walters I, p. 3). Plaintiffs are not able to use the phone to call or to receive calls from their attorney because both have C-grade status (*id.* p. 4). C-grade inmates do not have commissary privileges (Plf. exh. 1). Walters complains that as a result he is issued only three sheets of paper per week and that this amount is insufficient to pursue his litigation efforts (Walters I, p. 6).

On June 4, 1984, Walters was transferred to Menard, allegedly in retaliation for his persistence in seeking access to the law library and for pursuing this action (Walters I, p. 5). Apparently inmates in segregation at Menard are permitted direct access to the law library (*id.* pp. 5–6). Walters, however, has been allowed fewer than six visits to the library, even after making numerous written requests (Walters IV, pp. 1–2). Allegedly, favoritism determines which segregated inmates are permitted access to the library (Walters I, pp. 5–6). Menard inmates in segregation apparently have no access within the institution to attorneys, paralegals or law students. There is also no group of inmate clerks to assist segregated inmates (*id.* p. 6). Consequently, Walters has had no regular direct or indirect access to Menard's legal resources for a year.

Walters alleges that as a result of defendants' practices his civil rights complaints were dismissed and he has been unable to present a meaningful defense to an assortment of disciplinary charges (Wal-

---

**5.** An inmate-clerk at Menard reports that he was harassed and retaliated against because of the legal assistance he had furnished other inmates (Tedder). Ultimately, Tedder was barred by the Librarian from continuing his law clerk job, even though the Institutional Assignment Committee had unanimously voted to keep him in that position.

ters I, pp. 3–4). He further alleges that he has been unable to file a timely petition for certiorari with the United States Supreme Court, adequately defend himself against a new criminal charge, or challenge his two-week confinement in a strip cell (Walters IV, pp. 2–3, Ans. to Interrog. # 3). Ganci alleges that he has been unable to bring a post-conviction action or a civil rights action challenging the conditions of his confinement because of his severely attenuated access to legal resources (Ganci I, p. 3). As a result of a post-conviction action Ganci's co-defendant was released from prison because of trial errors (Ganci III, p. 3).

## C. Reasonable Likelihood of Success on the Merits

"It is now established beyond doubt that prisoners have a constitutional right of access to the courts." *Bounds v. Smith,* 430 U.S. 817, 821, 97 S.Ct. 1491, 1494, 52 L.Ed.2d 72 (1977). The *Bounds* Court held that this "fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Id.* at 828, 97 S.Ct. at 1498. *Bounds* recognized that there are many alternatives to a law library that will still ensure meaningful access to the courts:

> Among the alternatives are the training of inmates as paralegal assistants to work under lawyers' supervision, the use of paraprofessionals and law students, either as volunteers or in formal clinical programs, the organization of volunteer attorneys through bar associations and other groups, the hiring of lawyers on a part-time consultant basis, and the use of full-time staff attorneys, working in either new prison legal assistance organizations or as part of public defender or legal services offices.

*Id.* at 831, 97 S.Ct. at 1499–1500.

The initial hurdle for plaintiffs is to show that they have been adversely affected in some way by defendants' policy. Intuitively, there would appear to be no need in access to court cases for plaintiffs to show actual prejudice. The rationale for a no-prejudice approach is that inmates may need to have access to legal resources in order to learn that they have a colorable claim as well as to frame a cause of action. A requirement that inmate plaintiffs be thwarted in their active pursuit of an existing lawsuit before they can bring an access-to-court claim assumes a degree of access to legal resources that may not exist.

As defendants point out, however, there is some indication by the Seventh Circuit that an inmate must claim to have been actually prejudiced by defendants' policies. *See e.g., Jones v. Franzen,* 697 F.2d 801, 803 (7th Cir.1983); *Bach v. Coughlin,* 508 F.2d 303, 308 (7th Cir.1974); *see also Isaac v. Jones,* 529 F.Supp. 175, 179 (N.D.Ill. 1981). Plaintiffs here have met even the more stringent test. Both have alleged that their pursuit of legal remedies has been thwarted by their inability to gain meaningful access to sufficient legal resources. These allegations are sufficient.

Plaintiffs and most of the class members do not have direct physical access to a law library. In effect, this case thus tests the adequacy of the alternatives to direct library access provided by the defendants to meet their obligation of ensuring that segregated inmates have meaningful access to the courts.[6] Due to the state's failure to provide any evidence as to the nature and operation of these alternatives, this court must rely upon the description given by plaintiffs.

The evidence reveals that segregated inmates must rely exclusively upon inmate clerks who have little or no legal experience, formalized training, or supervision by attorneys. The clerks are supervised and paid by the Department of Corrections, which is responsible for imprisoning clerks

---

**6.** The adequacy of the prison libraries are of course relevant to determining the quality of the inmate clerk system and to the shaping of the remedy, if such is ordered.

and their inmate clients, is the target of much inmate legal action, and which has pressured the clerks to limit the number of actions against the Department. Inmates must request specific legal materials. They cannot use legal materials directly, but must obtain copies of the materials sought. Yet, inmates may only be able to obtain 300 pages of photocopied material per year. Access to the inmate clerks is occasional and legal research is accordingly extremely cumbersome. Telephonic access to outside counsel is limited or non-existent for segregated inmates. Even though the vast majority of inmates when unassisted are incapable of legal research or of drafting legal documents, they have no contact with any trained legal personnel.

█ This system does not survive constitutional scrutiny. Courts have repeatedly held unconstitutional systems featuring sole reliance on inmate clerks to obtain legal materials which must be specifically requested by inmates. *See Williams v. Leeke,* 584 F.2d 1336, 1338–39 (4th Cir. 1978), *cert. denied* 442 U.S. 911, 99 S.Ct. 2825, 61 L.Ed.2d 276 (1979); *Toussaint v. McCarthy,* 597 F.Supp. 1388, 1413 (N.D. Calif.1984); *Johnson v. Galli,* 596 F.Supp. 135, 138 (D.Nev.1984); *Kendrick v. Bland,* 586 F.Supp. 1536, 1551 (W.D.Ky.1984); *Martino v. Carey,* 563 F.Supp. 984, 1003–04 (D.Or.1983); *Canterino v. Wilson,* 562 F.Supp. 106, 110 (W.D.Ky.1983); *Hooks v. Wainwright,* 536 F.Supp. 1330, 1341–42 (M.D.Fla.1982).

Inmates often do not have the legal sophistication, much less the basic literacy skills, to conduct thorough legal research, even if they have access to a law library. In fact, some courts have held that even when a law library is adequate the state must provide additional assistance to inmates in order to ensure that their research efforts will not be thwarted by illiteracy or inexperience. *See e.g., Cruz v. Hauck,* 627 F.2d 710, 720–21 (5th Cir.1980); *Cody v. Hillard,* 599 F.Supp. 1025, 1060–1061 (D.S.D.1984); *Canterino, supra,* 562 F.Supp. at 110; *Hooks v. Wainwright,* 536 F.Supp. 1330, 1341 (M.D.Fla.1982); *Glover*

*v. Johnson,* 478 F.Supp. 1075, 1096 (E.D. Mich.1979); *Wade v. Kane,* 448 F.Supp. 678, 684 (E.D.Pa.1978), *aff'd without* opinion, 591 F.2d 1338 (3d Cir.1979).

Plaintiffs here have no direct access to a law library even though

> [l]egal research often requires browsing through various materials in search of inspiration; tentative theories may have to be abandoned in the course of research in the face of unfamiliar adverse precedent. New theories may occur as a result of a chance discovery of an obscure or forgotten case. Certainly a prisoner, unversed in the law and the methods of legal research, will need more time or more assistance than the trained lawyer in exploring his case. It is unrealistic to expect a prisoner to know in advance exactly what materials he needs to consult.

*Williams v. Leeke,* 584 F.2d 1336, 1339 (4th Cir.1978), *cf. Corgain v. Miller,* 708 F.2d 1241, 1250 (7th Cir.1983) (describing "Catch 22" for inmates having to request specific materials). However undertaken, inmate legal research efforts are greatly hindered by their sole reliance on inmate clerks for legal advice and assistance, by the extremely cumbersome nature of the runner system, and by the limits on the amount of material they can obtain by photocopying from the law library.

█ Inmates in segregation are assisted to some extent by the inmate clerks. The Supreme Court has recognized the usefulness and importance of the legal assistance provided inmates by fellow inmates. *See Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). The clerks serving plaintiffs and other segregated inmates, however, are not formally trained. There is no provision for continuing education programs. There is no evidence that inmate clerks have any access to attorneys. Because of the press of numbers and the restrictions inherent in the "runner" system, clerks have limited time to meet with inmates and to perform legal work on their

behalf. While *Bounds* recognizes the constructive role that can be played by inmate clerks in providing meaningful access to the courts, the Court expressly stated that those inmate clerks should receive paralegal training and be under a lawyer's supervision, 430 U.S. at 831, 97 S.Ct. at 1499. Subsequent decisions have not countenanced use of dependent, untrained and inadequately supervised individuals as the sole means of giving inmates access to the courts. *See Harrington v. Holshouser*, 741 F.2d 66, 69–70 (4th Cir.1984); *Ramos v. Lamm*, 639 F.2d 559, 584–85 (10th Cir. 1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981); *Cruz v. Hauck*, 627 F.2d 710, 720–21 (5th Cir.1980); *Kendrick v. Bland*, 586 F.Supp. 1536, 1552 (W.D.Ky.1984); *Canterino v. Wilson*, 562 F.Supp. 106, 110–112 (W.D.Ky.1983); *Hooks v. Wainwright*, 536 F.Supp. 1330, 1346–1352 (M.D.Fla.1982). Rather, when inmates have no access to a law library they must be provided with assistance by trained, skilled, and independent legal personnel. *See e.g. Lovell v. Brennan*, 566 F.Supp. 672, 696 (D.Me.1983); *Canterino, supra.*

■ The analysis of a meaningful access-to-court claim must proceed on a case-by-case basis and be rooted in the particular facts of each case. *See Ramos v. Lamm*, 639 F.2d 559, 583 (10th Cir.1980), *cert. denied* 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 239 (1981). This analysis is akin to the "totality of circumstances" approach to Eighth Amendment challenges to prison conditions. *See Rhodes. v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981). Plaintiffs point to several practices that by themselves may not rise to a level of unconstitutionality, but which reinforce the unacceptable operation of the current system.

Plaintiffs are denied all telephonic contact with their attorneys. Given that plaintiffs are denied use of the telephone because of their violation of prison rules, lack of telephonic contact with their attorneys might not be unconstitutional if they had fuller access to the prison library or to trained legal personnel. *Cf. Johnson by Johnson v. Brelje*, 701 F.2d 1201, 1208 (7th Cir.1983). They, after all, can still communicate with their attorneys by mail. In this case, however, they claim that their access to legal materials is extremely attenuated and they have no contact with any trained legal personnel within their institutions. Consequently, the lack of any telephonic access to counsel weighs more heavily on the side of unconstitutionality. *Cf. Brelje, supra; Johnson v. Galli*, 596 F.Supp. 135, 138 (N.D.Nev.1984).

■ Similarly, the 300-page per-year limit on photocopying has a much more severe effect under the institutional circumstances. Inmates are undoubtedly not entitled to unlimited free photocopying as a matter of right. *See e.g. Kendrick v. Bland*, 586 F.Supp. 1536, 1553 (W.D.Ky. 1984) (citing cases); *cf. Gibson v. McEvers*, 631 F.2d 95, 98 (7th Cir.1980). In this case, however, the photocopying limit impinges directly on the plaintiffs' ability to conduct legal research because the only means by which they can obtain legal materials is by photocopying. It would be extremely difficult for even a trained attorney to complete research on a case of any substance without perusing opinions, treatises and other materials totalling several hundred pages. The typical inmate in segregation, unschooled, forced to rely on untrained clerks, and denied any physical access to a library for browsing, cannot be expected to do better.

Plaintiff Walters alleges that his allottment of three pages of paper per week denies him meaningful access to the courts. *Bounds* found it "indisputable that indigent inmates must be provided at state expense with paper and pen to draft legal documents, with notarial services to authenticate them, and with stamps to mail them." 430 U.S. at 824–25, 97 S.Ct. at 1496. Some courts have upheld stringent limits on the amount of paper given inmates. *See e.g. Robbins v. South*, 595 F.Supp. 785, 789–90 (D.Mont.1984). Walters' claim, however, must be viewed in context. He must rely exclusively on pa-

per to communicate with friends and family as well as to conduct this lawsuit. He has not even indirect access to the prison library. He has been denied telephonic contact with his attorneys or family. In these circumstances Walters has a reasonably good chance of establishing that the present limit on paper unduly restricts his ability to communicate with his attorneys and does not survive constitutional muster.

## D. Irreparable Harm

■ As a result of their allegations and the uncontradicted evidence, the plaintiffs have established a substantial likelihood of irreparable harm. The inmate's right of meaningful access to the courts is as fundamental as any other. *Adams v. Carlson*, 488 F.2d 619, 630 (7th Cir.1973). Inmates who are denied meaningful access to the courts are unable to protect or assert the whole panoply of rights to which even they are entitled. Plaintiffs have made a reasonable showing that the methods employed by defendants to give inmates access to legal resources are wholly inadequate as a matter of law.

■ A continuing violation of constitutional rights constitutes irreparable injury. *See* Wright & Miller, *Federal Practice & Procedure* § 2948 at 440; *cf., Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976). Without prompt injunctive relief plaintiffs will be left with no adequate remedy at law. Damages cannot compensate a wrongfully-imprisoned inmate who is unable to prepare a post-conviction petition or the inmate whose meritorious civil rights petitions are denied because the pleadings were inartfully drawn by that inmate without full access to legal resources and relying on an ill-trained fellow inmate.

The threat of irreparable harm is especially evident with respect to the two plaintiffs. They are mounting a wide-ranging and ambitious challenge to defendants' policies and practices. Unconstitutional infringement on their access to the courts will prejudice their right to a full and fair hearing of their lawsuit. The rights of future inmates who challenge prison policies limiting access to the courts will also be prejudiced to the extent hindrance of plaintiffs' ability to mount a full challenge to present policies results in an adverse precedent.

## E. Balance of Hardships

■ The balance of hardships favors the defendant on the class issues at this point. A preliminary injunction is designed primarily to preserve the status quo, pending a final hearing on the merits. *Dos Santos v. Columbus-Cuneo-Cabrini Medical Center*, 684 F.2d 1346, 1350–51 (7th Cir.1982). Plaintiffs are not seeking to enjoin the defendants from acting. Rather, on the basis of the pleadings and a limited record, they seek injunctive relief compelling the defendants to make major statewide improvements in the system for providing segregated inmates with access to legal resources.

Three considerations tip the balance of hardships in favor of the defendants on the issue of classwide relief. First, district courts have been warned to exercise great care in ordering major institutional changes in state prison operations. *See Pell v. Procunier*, 417 U.S. 817, 827, 94 S.Ct. 2800, 2806, 41 L.Ed.2d 495 (1974). Second, the record is extremely limited at present. There is little or no information about several of the institutions that would fall within the scope of a statewide preliminary injunction. Third, while preliminary injunctions on the pleadings are hardly unprecedented, the usual course is to have a hearing before issuing such an injunction. Assuming that the more complete record mirrors the current one, the balance will tip back in plaintiffs' favor. At that point the court will be able to fashion preliminary injunctive relief that is more closely tailored to the scope of the constitutional violation and the conditions at each institution.

The balance of hardship may tip the other way, however, with respect to the individual plaintiffs. The uncontradicted and substantial evidence was that they have little or no direct access to the prison li-

braries, no contact with any trained legal personnel within their institutions, and no telephonic contact with their attorneys, even though they are involved in a complicated piece of litigation. Walters is especially disadvantaged. His writing materials are extremely limited and he has been transferred to an institution over 300 miles from his attorneys. Granting preliminary relief to individual plaintiffs will not substantially disrupt the existing institutional scheme if, in fact, their access has remained as limited as once it was. This court is, however, well aware that increased access for plaintiffs was the subject of motions and several conferences, and we are uncertain of the present status of that matter. We therefore hesitate to proceed further without more current information.

### F. Public Interest

The public is ill-served by both the systematic denial of basic constitutional rights to an inmate class and the institutional upheaval that may result from an overly broad and premature preliminary injunction. The public, however, clearly does not benefit from a poorly tried lawsuit or a denial of relief which should be granted. Courts are far more apt to err when a plaintiff is unable to develop fully his or her case. Error may stem from either the difficulties in comprehending plaintiffs' case or from the court bending over backwards to compensate for the deficiencies in plaintiff's case. Consequently, preliminary relief that enables plaintiffs to adequately prepare and pursue their cases serves the public interest.

### G. Preliminary Injunctive Relief

■ The court is persuaded that defendants are not satisfying their responsibilities under *Bounds* and are denying plaintiffs and the members of the class they represent meaningful access to the courts. A preliminary injunction on the classwide claims, however, is premature at this point. The record simply is not complete enough for the court to determine

with assurance that segregated prisoners in all maximum security institutions are being denied meaningful access to the courts. There is simply no significant information about several institutions. The underdeveloped record also prevents the court from framing preliminary relief tailored to both the extent of the constitutional violation and the specifics of each institution. Thus, plaintiffs' motion for immediate establishment of a training and continuing education program for inmate clerks, and the provision of supervising lawyers independent of the institution, is denied without prejudice. The motion to restrain defendants from transferring Richard Baker, the only trained inmate clerk at the Joliet Correctional Center, is denied as moot. Baker was transferred from Joliet to another institution on July 26, 1984 (7/31/84, Archibald Aff.). Defendants are undoubtedly aware that if they transferred Baker in retaliation for his role in this lawsuit or for his activities as a sort of jailhouse lawyer they will be held liable. *See e.g., Shango v. Jurich,* 681 F.2d 1091 (7th Cir.1982); *Buise v. Hudkins,* 584 F.2d 223, 229 (7th Cir.1978), *cert. denied* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

The interests of both the parties and the public are best protected by prompt limited discovery to determine the system in place at each institution and a timely hearing on the specifics of a preliminary injunction. The parties are directed to come to that hearing with detailed recommendations as to the appropriate injunctive relief. In preparing their recommendations the parties should examine carefully the options outlined in *Bounds* and its progeny. They should also frame their proposals with reference to the characteristics of the various institutions and their segregated inmates. By having the defendants prepare such recommendations the court ensures that the state's expertise and experience in operating these institutions will be both respected and capitalized upon.

■ It is too early to weigh the merits of Walters' claim that he was transferred

to Menard, an institution 300 miles away from his counsel, in retaliation for his persistent attempts to gain access to the Joliet library and his maintenance of this lawsuit. A transfer taken in retaliation for the exercise of a constitutionally-protected right is actionable under 42 U.S.C. § 1983 even if the transfer, if taken for a different reason, would have been proper. *Matzker v. Herr*, 748 F.2d 1142, 1150 (7th Cir.1984).

Similarly, preliminarily enjoining defendants from transferring plaintiffs to institutions far away from Chicago in order to hinder plaintiffs' litigation efforts is inappropriate. First, such an order would only be directing defendants to do what already they are bound to do: obey the Constitution. Second, without a transfer of Ganci there is no present controversy on this issue. If Ganci is transferred he can then make his case to this court that he is being punished for exercising his constitutional rights.

### OTHER MOTIONS

■ Defendants have moved to dismiss Governor Thompson and Secretary of State Edgar on the grounds that they did not have the requisite personal involvement in formulating or implementing the challenged policies. *See Monell v. Department of Social Services of the City of New York*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). The complaint alleges that Governor Thompson is responsible generally for operating the state prisons, but makes no mention of any personal involvement by the Governor with any of the specific policies at issue in this case. While Edgar is the State Librarian, Ill.Rev.Stat. ch. 128, ¶ 101, *et seq.*, his role, if any, in the operation of prison libraries, appears by statute to be at most minimal and advisory. The complaint contains no allegation that Edgar had any personal involvement with the challenged policies. Plaintiffs have not opposed these motions and dismissal is appropriate.

■ Defendants have also moved to dismiss defendant Lane, the Director of the Illinois Department of Corrections. Dis-

missal on *Monell* grounds is premature. The complaint alleges that Lane is responsible for the policy restricting the access of segregated inmates to the prison law libraries.

■ In its January 11, 1984 Memorandum and Order this court dismissed several of Walters' individual civil rights claims. Plaintiffs argue that this dismissal stemmed from Walters' lack of access to legal resources. They seek to permit Walters to revive some of these claims in a separate action and thus move for voluntary dismissal of the claims without prejudice under Federal Rules of Civil Procedure 41(a)(2). In effect, plaintiffs seem to be asking for the voluntary dismissal of claims already dismissed. We see no reason to reach out to change (if change it is) the legal posture of aging grievances which plaintiffs, in the last year and a half, have not sought to vindicate. That motion is denied.

■ Finally, plaintiffs' motion for a protective order covering survey forms completed by certain inmates is granted. Plaintiff conducted the survey in order to determine the length of time inmates typically spent in segregation and after defendants refused to produce information to that effect. Plaintiffs argue that release of all the surveys, some of which were attached to the motion for class certification, will *inter alia* expose inmates to retaliation and merely duplicate information already available to the defendants. Defendants indicate that they seek survey forms to oppose a (fully briefed) motion for class certification, even though they have not suggested that the information in the forms already released has been inaccurate. In light of this court's treatment of the class certification issue in the instant opinion, the balance tips in plaintiffs' favor.

### Conclusion

Plaintiffs' motion for class certification is granted and its motion for preliminary injunction on the pleadings is denied without prejudice. The motion for voluntary dis-

missal of the individual claims is denied. Defendants' motions to dismiss Governor Thompson and Secretary of State Edgar from this action is granted. Plaintiffs' motion for a protective order is granted.